**COALITION FOR CANYON PRESERVATION, Plaintiff,**

v.

**Karl S. BOWERS, in his official capacity as Administrator, Federal Highway Administration; Brock Adams, in his official capacity as Secretary, U.S. Department of Transportation; Ronald Richards, in his official capacity as Director, Montana Department of Highways; George Vucanovich, William Kessner, Dave McNally, Baxter Larson and John Cote, in their official capacity as members of the Montana Highway Commission; Charles F. Brooks, in his official capacity as District Ranger, Hungry Horse Ranger Station, U.S. Forest Service; John A. Galloway, Defendants.**

No. CV 79–1–M.

United States District Court,
D. Montana,
Missoula Division.

Nov. 14, 1979.

Steven J. Perlmutter, Helena, Mont., for plaintiff.

Terrence L. J. Clausen, Donald Douglas, James R. Beck, Nicholas A. Rotering, Helena, Mont., for Mont. Dept. of Highways, Ronald Richards, Vucanovich, William Kessner, Dave McNally, Baxter Larson and John Cote.

Allen McKenzie, Asst. U.S. Atty., Butte, Mont., for federal defendants Bowers, Adams and Brooks.

## OPINION AND ORDER

RUSSELL E. SMITH, District Judge.

Plaintiff, which is an environmentally concerned nonprofit corporation, and has standing to sue, brings this action to enjoin the reconstruction of that portion of U.S. Highway No. 2 extending from Hungry Horse, Montana, to West Glacier, Montana, because of failure of various state and federal agencies to comply with federal and state laws designed to protect the environment.

The highway in question was built in 1932. In 1962 the Montana Department of Highways (MDH) started planning to upgrade the segment in question. A public corridor hearing was held at Hungry Horse, Montana, in January 1969, and, at least by May 1, 1971, when a draft environmental impact statement (DEIS) was issued, the route, with possible alternatives, had been determined. At those times it was proposed that, in a first stage, four lanes be built on the west 6.0 miles starting at Hungry Horse and, in a second stage, that another two lanes be added to the final 4.8 miles. A final environmental impact statement (FEIS) and 4(f) statement, which followed a noticed public hearing on September 1, 1971, was mailed by the MDH to the Department of Transportation on March 13, 1973. In it the four-lane highway now proposed for the whole section was approved. The FEIS was sent to the Council on Environmental Quality on January 3, 1975, and noticed in the National Register on January 17, 1975. An informational hearing was held by MDH in February 1975. All requests for design approval were granted by the Federal Highway Administration by April 8, 1975, and right-of-way authorizations by May 15, 1975. Thus, the proposal for a four-lane highway has been before the public at least from 1969 on, and the proposal for the presently designed highway has been before the public since February 1975. This lawsuit was filed January 5,

1979, about ten years after the first proposals, and four years after the final plans by the Federal Highway Administration.

In this case it is conceded that the road section in question needs upgrading. There is not now and never was any question but that there would be some construction. The DEIS prepared here was the first one prepared by MDH. It noted that ratings for the foundation, surface, drainage, safety, and capacity of the existing highway were very low.[1] It described the project and the resources of the area, stated the alternate routes being considered and the impact of the proposed action on humans, the land, fish and wildlife, vegetation, water and air, geology, transportation, and utility systems resources. It noted adverse effects in the displacement of homes and businesses, removal of trees, and damage to parks. It noted the benefits of the project. It was not elaborate, but it was concerned with the reconstruction of an existing highway which ran through a sparsely settled mountain valley. To the people who lived in the valley and to the governmental agencies who had any interest in it, the map of the project in and of itself disclosed the impact of the project reasonably well. The FEIS which followed was more sophisticated, and it is apparent from it that the MDH was receptive to suggestions made at the public hearings and that it did respond to various comments which had been made about the project. I find nothing to indicate that there was any intent to avoid or evade the environmental protection laws.

Now plaintiff seeks to fault the procedures for many failures. Except on the issues presented at the hearing which this opinion treats in some detail, it is left to the court's imagination to conjure up what problems existed in many fields mentioned in the laws and regulations, such as the field of "impacts on social and community values and structures" and what might have been said about them. Complaint is made of the failure to discuss the noise and

air pollution problems and to articulate something about them. Noise and air pollution were not discussed at the public hearings, nor in the DEIS. In the FEIS it is noted that noise and air pollution would increase during construction and that noise pollution could be expected to increase due to future increased use of the highway. It may be that there should have been more talk about noise and air pollution and more elaborate problem-solving. But the fact was that there was going to be construction and that problems of noise and air pollution would exist. It may be that the differences in decibel and dust levels as between repair and two-lane construction and four-lane construction could have been articulated. How that could have changed anyone's thinking is not clear to me. The public does have a right to the articulation of a problem, and if there was a right in the plaintiff here, and if that right survived the failure to raise the issue in any way prior to this lawsuit, the protection of that right does not weigh very heavily in any kind of a balancing of all of the values involved. For these reasons many of the plaintiff's claims are not discussed in this opinion.

Some substantial problems do appear. Plaintiff strenuously urges that an improved two-lane construction was a reasonable alternative to four-lane construction and should have been considered. As previously indicated, in 1969 the plans called for an initial four- and two-lane construction, and a subsequent additional two-lane construction. At the public meeting in January 1969, strong public opposition to any two-lane construction appeared, and, due to concerns for safety, there was no public support for two-lane construction on all or part of the highway between Hungry Horse and West Glacier. From then on the planning was directed to a four-lane construction. At none of the subsequent hearings was a two-lane alternative suggested, nor did MDH on its own motion consider and reject it as an alternative.

1. The FEIS notes:
"1. Foundation—maximum of 10—rated at 0
2. Surface—maximum of 30—rated at 12

3. Drainage—maximum of 10—rated at 5
4. Safety—maximum of 20—rated at 1
5. Capacity—maximum of 30—rated at 11."

There is a conflict in the evidence as to whether an improved two-lane strip is feasible. Plaintiff's expert Skrotzki said "yes" and defendants' experts Stewart, Barnard, Walters, and Skoog said "no." Skrotzki traveled the road but once, in 1977, before he became professionally interested in it; he drew no plans and made no surveys. The defendants' experts, because of their training, years of experience in highway design, and actual work on the particular section, were, I believe, more credible than was plaintiff's expert. The road is a dangerous one. Safety was the concern of the public, and that in turn depended on the passing sight distance afforded. By improving the two lanes, the passing sight distance could be increased about 7%. This would provide a level of service of "D," "E," or "F," whereas the recommended level of service was "B."[2] A "B" level of service would permit 60-miles-per-hour traffic and accommodate actual traffic speeds of 45 to 50 miles per hour.

In a sense, it cannot be said that a two-lane alternative was not feasible when two lanes had been used for about 30 years prior to any planning to rebuild the highway, but the highway, as a matter of both common knowledge and engineering standards, was dangerous, and the FEIS specifically so finds. If a prime motive in the rebuilding was to achieve safety, then an improved two lanes was not feasible, and I so find. This finding is based on the evidence admitted in the court hearing and does nothing, of course, to eliminate any deficiency in the environmental impact statements.

A court is required to set aside agency action findings and conclusions reached "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The National Environmental Policy Act requires "a detailed statement by the responsible official on—(i) the environmental impact of the proposed action." 42 U.S.C. § 4332(C)(i). The purpose of this requirement is stated in *Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (9th Cir. 1974), as follows:

First, it should provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences. . . . Secondly, the impact statement should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information.

(Footnote omitted.)

■ An agency, however, is not compelled to consider every conceivable alternative, but only those which are necessary to permit a reasoned choice. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir. 1973). Given the facts that the existing highway was unsafe, that it was located in mountainous country with many steep grades and curves, and that it was a main highway which the public insisted be upgraded from a safety standpoint, how would the alternative of an improved two-lane highway have appeared to a reasonable highway engineer when the decisions were made? It may be that an engineer knowing the country and standards of safe design could reject without study any notion of a two-lane highway because it could not be built to provide the required degree of safety. If the matter was that obvious, then the alternative was not a reasonable one, and no study or articulation was necessary. It may be that elaborate studies and surveys were needed to determine what safety could be achieved by leveling the hills, widening the curves, and providing three lanes on some hills, and that, had those studies been made, they would have shown that the improved two-lane highway was the better of the two choices. It may also be that a very slight effort would have been required to demonstrate that the two-lane alterna-

2. Service levels are recommended by what the highway engineers call the "Blue Book" (A Policy on Geometric Design of Rural Highways, 1965 ed., published by the American Association of State Highway Officials).

tive was not reasonably feasible. It may be that the work done on the plans which existed prior to the 1969 meeting, at which the public rejected the two-lane construction on the eastern part of the project, contemplated the upgrading of the existing two-lane highway to the extent that it could be upgraded, and that in the course of that design the engineers may have learned what could and could not have been accomplished by an improvement of the two lanes. I am simply unable to tell from the evidence whether the alternative suggested was the kind of an alternative which the agency should have studied and reported. I might be justified in these circumstances in finding that the plaintiff has failed in sustaining its burden of proof, but I choose to rest the decision on the doctrine of laches because I believe that doctrine provides a broader base for the decision.

The evidence does not warrant a finding that the result reached was wrong; at the most it may indicate that the procedure was faulty. If at any time during the planning the plaintiff had taken the position it now takes, I think it highly probable that the two-lane alternative would have been sufficiently examined and the reasons for a choice between it and the four-lane plan stated. In short, the procedural defect which plaintiff now seeks to correct was easily correctable by agency action with no delay.

■ Over a million dollars has been spent on this project. If the plans are now altered, some of that expenditure will be lost. We are in an inflationary spiral, and delay will be costly. Plaintiff's rights are dubious at best, and there has been an inordinate delay, not only in bringing the action, but in voicing objections. On a balancing of all of the values, I believe that laches bars relief. I realize that this action is brought in the public interest, and that in these cases the doctrine of laches is looked upon with disfavor. However, the doctrine is applicable in

NEPA cases,[3] and I think that it should be applied here.

It is further urged that the new design and corridor hearings were required because design approval was not requested within the three years after the hearing of September 1971. The policy and procedure memorandum in effect during the times here involved provided:

[I]f design approval is not requested within three years after the date of the related design hearing held, or opportunity for a hearing afforded, under this PPM, a new hearing must be held or the opportunity afforded for such a hearing.

PPM 20–8; § 6(f). The related design hearing here was held September 1, 1971, and the design approval for Hungry Horse to Coram was not requested until January 31, 1975, and for Coram to West Glacier until April 4, 1975. Notwithstanding that the requests for approval were late, approvals were granted on February 18 and April 8, 1975, respectively. An informational hearing was held by the MDH on February 10, 1975. About 75 residents attended. It was stated at that hearing that design approval had not yet been requested for the Coram—West Glacier section. The notes of the meeting indicate no requests for further hearings and in general expressed a disapproval of the delays and a desire for the project to get under way. Plaintiff further urges that, since the plans were changed to provide that the four lanes on the eastern portion be built at the same time as the four lanes on the western section, new location and design hearings were required.

If it be conceded that the plaintiff had a right to another hearing by reason of the delays and change in plans, still all of the facts were known as of February 10, 1975, and the delay of four years in bringing this suit is not explained. I deem these claims to be barred by laches.

The proposed highway will take one acre from a 68-acre abandoned Forest Service

**3.** *City of Rochester v. United States Postal Service,* 541 F.2d 967 (2d Cir. 1976); *Sworob v. Harris,* 451 F.Supp. 96 (E.D.Pa.), aff'd, 578 F.2d 1376 (3d Cir. 1978); *Dalsis v. Hills,* 424 F.Supp. 784 (W.D.N.Y.1976); *National Association of Government Employees v. Rumsfeld,* 418 F.Supp. 1302 (E.D.Pa.1976).

campground, and about 22,400 square feet out of the Hungry Horse campground owned by Flathead County. These park lands are protected by Section (f) of the Department of Transportation Act of 1966, as amended (49 U.S.C. § 1653), and Section 18 of the Federal Aid to Highways Act of 1968 (23 U.S.C. § 138). The Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 405, 91 S.Ct. 814, 818, 28 L.Ed.2d 136 (1971), said of them:

> These statutes prohibit the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative route exists. If no such route is available, the statutes allow him to approve construction through parks only if there has been "all possible planning to minimize harm" to the park.

(Footnotes omitted.)

The MDH was aware of these park lands and aware of the laws protecting them. The 4(f) statement contains a specific finding as follows: "It has been determined by the State of Montana Department of Highways, that there are no prudent and feasible alternatives to the taking of these public park lands for highway purposes." Alternatives were discussed and discarded. Steps were taken to minimize the damage done to the park lands. The alternative selected was the one approved by the public. The required findings were made, and I am unable to say from the record here that they were not made in good faith or that, again considering safety, there was in fact some feasible or prudent alternative, including the suggested alternative of an improved two-lane construction.

It is further contended, and evidence was introduced to this effect, that the four-lane construction would have a secondary impact on Bad Rock Canyon, which lies outside of the Hungry Horse—West Glacier portion of the highway. The alleged secondary effect is that at some subsequent time it will be easier to justify four-lane construction through Bad Rock Canyon, a place of scenic beauty, if the adjoining sections are four-lane. It appears to me that, if the aesthetic values of preserving some sort of a status quo in Bad Rock Canyon would, under any circumstances, be sufficient to prevent construction of an adjoining section, they are certainly sufficient to withstand any assault on the canyon itself. In my opinion, the secondary effect urged here is not of the significant kind which must be discussed. *See City of Davis v. Coleman*, 521 F.2d 661, 676 n. 18 (9th Cir. 1975).

Let judgment be entered denying plaintiff all relief.