COALITION FOR CANYON PRESER-
VATION, Plaintiff–Appellant,

v.

Karl S. BOWERS, Administrator, Federal
Highway Administration et al.,
Defendants–Appellees.

No. 79–4843.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 19, 1980.

Decided Oct. 9, 1980.

Steven J. Perlmutter, Helena, Mont., for plaintiff–appellant.

James C. Kilbourne, Dept. of Justice, Washington, D.C., Terrance L. J. Clausen, Helena, Mont., for defendants–appellees.

Before KENNEDY, SKOPIL, and ALARCON, Circuit Judges.

KENNEDY, Circuit Judge:

This is an environmental case involving the proposed construction of a 10.8 mile four–lane segment of U.S. Highway 2, the main access route into Glacier National Park.  The Coalition for Canyon ·Preservation (Coalition) appeals from the judgment of the district court denying it all relief.

Four issues are raised on appeal: (1) did the district court abuse its discretion in holding that the suit was barred by laches; (2) was the environmental impact statement (EIS) inadequate under state and federal environmental policy acts because it did not adequately discuss secondary impacts and the alternative of an improved two–lane road; (3) was the Secretary of Transportation's § 4(f) determination invalid because he failed to consider the "feasible and prudent" alternative of an improved two–lane road; and (4) did the public hearings procedures followed by defendants violate the regulations of the Federal–Aid Highway Act? For the reasons set forth below, we reverse and remand this case to the district court.

## BACKGROUND

U.S. Highway 2 extends the width of Montana, running roughly parallel to the Canadian border and from 40 to 60 miles south of it; for most of its length in Montana the highway is a two–lane facility. In 1962, the Montana Department of Highways (MDOH) began planning to upgrade a 10.8 mile segment of Highway 2 running easterly from the South Fork Bridge crossing near Bad Rock Canyon through Hungry Horse, Martin City and Coram to West Glacier. The proposed improvement is the main highway approach to the west entrance of Glacier National Park. By late 1968, the MDOH had formal plans for a four–lane road between Hungry Horse and a point just east of Martin City, with the remaining segment to West Glacier to be an improved and widened two–lane road.

For the next eight years, the project progressed through various design changes, hearings, and authorizations. The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347 (1976 & Supp. II 1978), was enacted effective January 1, 1970, and impact statements were prepared. The MDOH received right–of–way authorization from the Federal Highway Administration (FHWA) for the Coram to West Gla-

cier segment on January 6, 1976. Right–of–way authorization for the Hungry Horse to Coram segment was received on May 15, 1978. Beginning in the spring of 1976, some local residents began advocating an improved and widened two–lane road in lieu of the four–lane proposal. They started a campaign of letter writing and petition circulation, but the record does not reveal the response to it.

On October 20, 1978, a timber sale contract was awarded by the U.S. Forest Service to remove timber from Forest Service parcels on the right–of–way for the Coram to West Glacier segment of the project. Timber cutting under the contract commenced on or about the second week in November, 1978, and has since been completed.

The Coalition for Canyon Preservation is a nonprofit corporation formed in November, 1978, and composed mainly of residents in the area affected. It filed suit against the Secretary of Transportation, the Administrator of the FHWA, the Director of the MDOH, and the members of the Montana Highway Commission on January 5, 1979.[1] The complaint alleged that: (1) the final EIS violated NEPA because it did not adequately discuss alternatives to the proposed action or its impacts on the environment; (2) the EIS violated the Montana Environmental Policy Act (MEPA), Mont. Code Ann. § 75–1–101 et seq. (1979), for similar reasons; (3) the public hearings on the draft EIS were not held in accordance with NEPA and appropriate regulations; (4) the MDOH did not timely request design approval, in violation of 23 U.S.C. § 128(a) and applicable regulations; and (5) the highway project included the taking of public parkland without the EIS–4(f) statement having considered the "feasible and prudent" alternative of an improved two–lane highway, in violation of § 18(a) of the Federal–Aid Highway Act of 1968, 23 U.S.C. § 138, and § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f).

1. Also named was the District Ranger of the Hungry Horse District, Flathead National Forest, who awarded a timber–cutting contract on part of the project. As the contract has been completed, that aspect of the suit is moot.

The Coalition sought declaratory equitable relief to prevent the federal and state defendants from taking any further action on the highway project, including accepting or opening bids, letting contracts, or acquiring further right–of–way, until they complied with NEPA and other applicable statutes and regulations.

After a two–day evidentiary hearing, the district court on November 14, 1979, denied all relief and dismissed the action on the ground of laches. *Coalition for Canyon Preservation v. Bowers*, 479 F.Supp. 815 (D.Mont.1979). That court additionally discussed the merits of some of the Coalition's substantive claims. On December 18, 1979, after having timely filed its notice of appeal, the Coalition applied to this court for injunctive relief and for expedition of its appeal. Injunctive relief was granted and the appeal was ordered expedited. Right–of–way acquisition is now complete, utilities have been relocated, and approximately 92 acres of timber have been cleared.

I.  Laches

Laches is not a favored defense in environmental cases. *Cady v. Morton*, 527 F.2d 786, 792 (9th Cir. 1975); *City of Davis v. Coleman*, 521 F.2d 661, 678 (9th Cir. 1975). Its use should be restricted to avoid defeat of Congress' environmental policy. In considering laches claims, it is relevant that the plaintiff will not be the only victim of possible environmental damage. *City of Rochester v. United States Postal Service*, 541 F.2d 967 (2d Cir. 1976); *City of Davis v. Coleman*, 521 F.2d at 678. Citizens have a right to assume that federal officials will comply with the applicable law. *Cady v. Morton*, 527 F.2d at 792. As we stated in *City of Davis v. Coleman* : "To make faithful execution of this duty contingent upon the vigilance and diligence of particular environmental plaintiffs would encourage attempts by agencies to evade their important responsibilities. It is up to the agency, not the public, to ensure compliance with NEPA in the first instance." 521 F.2d at 678.

The question whether laches bars an action depends upon the facts and circumstances of the particular case. *Lathan v. Brinegar*, 506 F.2d 677, 692 (9th Cir. 1974) (en banc). The decision to apply laches is primarily left to the discretion of the trial court, *id.*, but that discretion is, of course, confined by recognized standards. The district court must find (a) lack of diligence by the party against whom the defense is asserted and (b) prejudice to the party asserting the defense. *Lathan v. Brinegar*, 506 F.2d at 692.

An essential part of the diligence requirement is proof of knowledge of a legal right, assertion of which is delayed. *City of Davis v. Coleman*, 521 F.2d at 678. In determining a party's diligence, factors to be considered include: (1) whether the party has made an attempt to make his position known to the agency before the filing of suit; (2) the agency response to the request; and (3) developments such as preparatory construction that tend to motivate citizens to investigate the legal bases for challenging the agency action. *See Cady v. Morton*, 527 F.2d at 792; *City of Davis v. Coleman*, 521 F.2d at 673; *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir. 1975).

In determining whether delay is prejudicial, a pertinent inquiry is whether substantial work on the project had been completed before suit was brought. *See Save Our Wetlands, Inc. v. United States Army Corps of Eng'rs*, 549 F.2d 1021, 1027–28 (5th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). In some cases, even substantial completion has been insufficient to bar suit. *See City of Davis v. Coleman*, 521 F.2d at 678 (30 to 50% of interchange completed); *Arlington Coalition on Trans. v. Volpe*, 458 F.2d 1323, 1328 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972) (acquisition of 93.9% of all dwellings, 98.5% of all businesses, and 84.4% of all necessary right–of–way). The number of dollars spent or the percentage of project completion is significant primarily to indicate if it would be difficult to alter the basic plan. If the

difficulty is substantial, compliance with state or federal environmental policy acts may not result in any major changes or environmental benefits. *See Save Our Wetlands, Inc. v. United States Army Corps of Eng'rs*, 549 F.2d at 1028; *City of Rochester v. United States Postal Service*, 541 F.2d at 977; *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 868–69 (5th Cir. 1975); *Steubing v. Brinegar*, 511 F.2d at 495; *Organizations United for Ecology v. Bell*, 446 F.Supp. 535, 551 (M.D.Pa.1978).

In holding that the Coalition's claims were barred by laches, the district court noted that the first formal proposals for the project were set out in a 1969 corridor hearing in Hungry Horse and that final location approval had been granted in April, 1975, while suit was delayed until 1979. The court also stressed that over one million dollars had been spent on the project, that if the plans were now altered "some of that expenditure [would] be lost," and that delay would be costly because of inflation. *Coalition for Canyon Preservation v. Bowers*, 479 F.Supp. at 819.

■ We hold the district court erred in attributing delay in suit from 1969 to 1979 to the fault of the plaintiffs below. As of 1969, the project contemplated was mostly a two–lane road. Even in the fall of 1971, the project was described as being a four–lane bituminous surfaced facility for the first six miles and a two–lane roadway for approximately 4.8 miles. Final authorization for a continuous four–lane road was granted in April, 1975, and an informational hearing in February, 1975, alerted residents that four lanes were contemplated, but final right–of–way authorization was not granted until May of 1978. This was well after plaintiffs began their 1976 campaign of letter writing and gathering signatures on a petition advocating an improved and widened two–lane facility. Moreover, until after the present suit was filed, the MDOH had not approved the

Plan, Specifications and Estimates pursuant to 23 U.S.C. § 117, except for right–of–way acquisition, clearing and grubbing, and utility relocation. The first preparatory activities altering the character of the environment did not begin until mid–November 1978, and the present suit was filed only six weeks later. Given these facts we do not believe that plaintiffs should be charged with delaying suit for a period of four to ten years. Because there was no serious prejudice to defendants, we need not pinpoint the time from which that delay should be measured.[2]

Furthermore, the facts do not show sufficient prejudice to the defendants to justify a holding of laches. The district court erred in determining that the increase in costs due to delay was a factor to be considered. NEPA by its very nature contemplates such delay. *See Shiffler v. Schlesinger*, 548 F.2d 96, 103 (3d Cir. 1977). The expenditure of one million dollars on this project is not alone sufficient prejudice to warrant a finding of laches. The actual expenditures are only one factor to be considered:

> [T]he prejudice to the defendant lies not merely in its actual expenditures or even in its claimed detriment, but rather in what Congress defines as prejudice. . . The prejudice is determined by extrapolating from the Congressional directive a set of criteria ·which the *agency* should use to determine what its interests are. Any agency action must be evaluated not only in terms of cost of slowing transportation system development and funds committed in that pursuit, but also, in the cost of unnecessary environmental harm.

*Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d at 868 (emphasis in original).

As this case stands now, right–of–way acquisition is complete, utility lines have been relocated, and approximately 92 acres of timber have been cleared. We are troubled by the fact that a bare right–of–way

---

**2.** See *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 868 n.9 (5th Cir. 1975) (court declined to address whether the period of delay should be measured from the date of the issuance of the EIS or from the date final Plans, Specifications, and Estimates were approved because of a lack of substantial prejudice to defendants).

will remain while the project is delayed for further NEPA compliance and also by the possibility that an ugly stretch of barren right of way will have been cleared needlessly if the project is not completed. Defendants have not shown, however, that there will not be a substantial environmental benefit if defendants are required to conform to environmental policy act requirements. Since Hungry Horse has not yet been affected, it is still possible to give more consideration to the primary and secondary effects of a four–lane highway passing through the main street of this small rural town and to possible alternatives to the taking of parkland. Construction has not yet commenced on the downslope of road leading to the two–lane bridge at the South Fork of Flathead River; it is not too late to give consideration to possible safety problems that may arise at that site when weather conditions are icy. Some of that land where the trees have been cut and cleared may be used for a roadway if an improved and widened two–lane road is selected, thus mitigating unnecessary damage. In sum, although we note that substantial resources have been spent on the proposed four–lane project and that environmental changes have already occurred, we believe the public interest can still be served by requiring full compliance with the law.

## II. Adequacy of the EIS

█ The judgment below rests on the doctrine of laches. A fair reading of the opinion, however, indicates that the court rejected plaintiff's substantive claims that the EIS was inadequate. *See Coalition for Canyon Preservation v. Bowers*, 479 F.Supp. at 817–19. We think it appropriate, in the interest of expediting this litigation, to decide these substantive issues, which the parties have fully briefed. *See City of Davis v. Coleman*, 521 F.2d at 673. We hold the EIS was inadequate.

### A. *NEPA Requirements*

The governmental procedural statute, 42 U.S.C. § 4332(2)(C), requires that an EIS include a "detailed statement" of:

(i) the environmental impact of the proposed action

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented

(iii) alternatives to the proposed action

(iv) the relationship between local short–term uses of man's environment and the maintenance and enhancement of long–term productivity and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

█ The standard of review in this circuit is clear. The "without observance of procedure required by law" standard of 5 U.S.C. § 706(2)(D) applies when the question is whether the EIS was adequate. *Lathan v. Brinegar*, 506 F.2d at 693. That determination is essentially a pragmatic one. *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552 (9th Cir. 1977) (per curiam). An EIS will be found to be in compliance with NEPA:

when its form, content, and preparation substantially (1) provide decision–makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information.

*Trout Unlimited v. Morton*, 509 F.2d 1276, 1282–83 (9th Cir. 1974).

We now turn to the Coalition's specific allegations that the EIS failed adequately to discuss (1) impacts of the proposed action and (2) the alternative of an improved and widened two–lane road. Our disposition of these allegations is based on a thorough review of the record.

### 1. *Lack of Detail*

The Coalition challenges the adequacy of the EIS with respect to air pollution, noise

impact, roadside businesses in Hungry Horse, the safety hazard created by the four–lane design approaching a two–lane bridge just west of Hungry Horse, the safety hazard created by the four–lane road through Hungry Horse where children tend to jaywalk, secondary impacts such as growth, land–use development, and social and economic activities, and the cumulative impact of the project on Bad Rock Canyon.

In discussing the Coalition's claims, the district court found that: "it is left to the court's imagination to conjure up what problems existed in many fields mentioned in the laws and regulations, such as the field of 'impacts on social and community values and structures' and what may have been said about them." *Coalition for Canyon Preservation v. Bowers*, 479 F.Supp. at 817. In arguing that there was sufficient compliance, defendants rely heavily on the district court's view that the Coalition's claims concerned remote or speculative impacts and on its finding that the defendants did not attempt to "avoid or evade the environmental protection laws."

■ We disagree with the district court's assessment of adequacy. It cannot fairly be said that all of the Coalition's challenges concerned remote or highly speculative matters. Moreover, subjective good faith is not the test for determining the adequacy of an EIS. The test is an objective one. *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 827 (D.C. Cir. 1977).

In addressing the question of land use, the EIS stated that much of the alignment of the highway would not change, but that it would still be necessary to clear approximately 92 acres of forest land and to take approximately 0.5 acres of parkland. The EIS stated:

This project should not have a significant effect on adjacent land use since the amount of the new Right–of–Way being taken is quite small and the existing access patterns will be left about the same as they are now. Although several businesses and homes . . . will have to be relocated, it is expected that they will try to relocate as near to the new highway as possible. Since this project will provide a new, 4–lane facility, the possibility does exist that development along the highway may increase at a faster rate than it has in the past.

Nothing further was said about increased development.

■ (a) *Air, Noise, and Water Pollution.* We have previously held that supporting studies need not be physically attached to the EIS and that they need only be available and accessible. *Trout Unlimited v. Morton*, 509 F.2d at 1284; *Life of the Land v. Brinegar*, 485 F.2d 460, 468–69 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Although it may be that facts supporting the conclusions in the EIS were technically "available" somewhere, the EIS gives no hints where to search or whether studies were in fact performed. Thus, the adequacy of the EIS must stand or fall on its own supporting documentation. We conclude that the EIS fails to give decision makers who are removed from the initial decision sufficient data from which to draw their own conclusions about air, noise, and water pollution.[3] *See County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1370 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

■ (b) *Safety Considerations.* No mention was made of the possible safety hazard of four lanes converging into two on

---

3. In discussing water, air and noise pollution, the EIS was conclusory and abbreviated. It stated that construction of the project "will result in a temporary increase in noise, air, and possibly water pollution while the new highway is under construction," but that "[u]pon completion of the project, these items should return to their present levels." In analyzing long–term impacts on noise, air and water quality, the EIS stated that the project would result in "increased noise, air and possibly water pollution due to the substantial increase in traffic." But nothing more was said except that such pollution would "occur anyhow" because traffic was bound to increase regardless of whether or not the project was built. Nothing referred to any studies or to facts on which these conclusions were based.

the downslope leading to the two–lane bridge crossing the South Fork of the Flathead River, a section of road that is icy in the winter. Nothing was said about increased safety hazards to children in the rural towns through which the four–lane highway will pass. Since these were not remote or speculative matters which may be omitted from discussion, the failure to discuss them is a further factor tending to show the EIS's inadequacy.

■ (c) *Secondary Impacts.* Although treatment of secondary impacts is not a specific requirement of an impact statement, the central focus is on those impacts, both primary and secondary, that have a "significant impact" on the environment. *Trout Unlimited v. Morton*, 509 F.2d at 1283 n.9; *City of Davis v. Coleman*, 521 F.2d at 680–81. We have previously noted that so-called "secondary" impacts are often as significant as "primary" effects. *Id.* at 676.

■ This case concerns several small rural towns connected by a relatively narrow 26–foot wide highway, as compared to the proposed 88–foot wide highway, with four 12–foot driving lanes, a 20–foot median, and 10–foot parking lanes with curbs and gutters in the town sections. The aerial maps of the area show that the towns of Hungry Horse, Coram and West Glacier are centered about the main road; tourism is their main source of income and roadside businesses are common. It is likely that this project will have major effects on the character of these towns. This case requires analysis of these secondary effects. The subject was not addressed in the EIS.

■ (d) *Cumulative Impacts.* The Coalition contends that the EIS was inadequate because it failed to address the "cumulative impacts" of the four–lane construction on adjacent areas, in particular the scenic Bad Rock Canyon west of Hungry Horse. The contention is based on the MDOH's plans to construct four–lane roadways in other nearby areas and on the Coalition's belief that this construction will create pressures eventually to upgrade the Bad Rock Canyon stretch of highway to four lanes.

On the record before us, we reject this contention. Nothing shows that the MDOH's plans to upgrade nearby areas are part of one comprehensive plan. Moreover, any significant impact on Bad Rock Canyon caused by the proposed project was too speculative at the time the EIS was prepared to require discussion. *See Lange v. Brinegar*, 625 F.2d 812 (9th Cir. 1980); *Trout Unlimited v. Morton*, 509 F.2d at 1295.

2. *Discussion of Alternatives*

■ The alternatives requirement of NEPA is not to be used for chronic fault-finding. *Life of the Land v. Brinegar*, 485 F.2d at 472. As the Supreme Court recently stated:

> Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). Only reasonable alternatives need be discussed. *Id.; Friends of the Earth v. Coleman*, 513 F.2d 295, 297 (9th Cir. 1975).

In this case, the EIS discussed several alternatives. Two alternative locations were studied for the portion of the road northwest of Martin City, three alternatives for the portion near Coram, and five alternatives for the portion in and around Hungry Horse. Additionally, the EIS stated that the "do–nothing" alternative was considered, but not recommended because of the poor alignment of the road, its numerous sharp, dangerous curves, restricted passing sight distances, and the need to accommodate projected traffic increases. The Coalition faults the EIS because it

failed to consider the alternative of an improved and widened two–lane road for any portion of the project.

▇ Several factors lead us to conclude that the alternative of an improved and widened two–lane facility was both reasonable and obvious, and that therefore the EIS is deficient. We consider it significant that in 1968 the MDOH originally planned for an improved and widened two–lane road for the part of this route between either Martin City or Coram and West Glacier. Moreover, evidence at trial showed that auxiliary lanes, such as climbing lanes, passing lanes, and turning lanes, were a recognized feature of highway design and that use of such lanes could improve traffic capacity. Although the MDOH did not consider, apparently, less than four–lane construction in and around Hungry Horse, evidence showed that in the town of Hungry Horse itself the terrain was level and that passing was not permitted. Thus, Hungry Horse did not present the same safety needs as outlying areas where the combination of rolling terrain, poor alignment, and limited passing sight distances created serious safety problems. There was also testimony that lower traffic capacity was generally acceptable in towns, partly because of their lower speed limits. The use of a narrower than four–lane road is made even more obvious by the possibility that parkland would thereby by spared.[4] See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Stop H–3 Ass'n v. Coleman, 533 F.2d 434, 438 (9th Cir.), cert. denied, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976).

Finally, it is important to note that in November, 1973, well before the final EIS was submitted by the state to the FHWA, regulations were proposed suggesting consideration of both fewer lanes and a design providing a "lower level of service" as alternatives. 38 Fed.Reg. 30,192 (1973). These regulations were finally promulgated on November 29, 1974. 39 Fed.Reg. 41,805 (1974) (codified in 23 C.F.R. § 771.18 (1975)).

### B. MEPA Requirements

▇ The Montana Environmental Policy Act, Mont.Code Ann. § 75–1–101 et seq., is virtually identical to § 102 of NEPA, 42 U.S.C. § 4332. The Montana Supreme Court has recognized that federal case law is an appropriate guide in interpreting MEPA. Kadillak v. Anaconda Co., 602 P.2d 147, 153 (Mont., 1979). For the reasons set forth above, we hold that the EIS failed to meet MEPA's requirement that the EIS contain a "detailed statement" of impacts and alternatives.

### III. Adequacy of the Section 4(f) Determination

Section 18 of the Federal–Aid Highway Act of 1968, 23 U.S.C. § 138, and § 4(f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1653(f), prohibit the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative exists. If no such route is available, the statutes allow the Secretary to approve construction through parks only if there has been "all possible planning to minimize harm to the park." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 411, 91 S.Ct. at 821.

As we have said before, the existence of an unexamined but viable alternative to the adopted plan can have a dual significance; it can render the environmental impact statement inadequate and provide a basis for overturning the Secretary of Transportation's decision that parkland could be used for highway purposes under § 4(f) of

---

4. The MDOH did consider the alternative of a 68· foot four -lane roadway without turnbays in Hungry Horse. This design, although requiring the taking of less parkland and being similar in width to the Coalition's proposed alternative, was rejected because turnbays were thought necessary for safety reasons. We do not question the adequacy of the EIS's statement discussing and rejecting this alternative. However, we conclude that it would have been reasonable to consider an improved two–lane road with turnbays in Hungry Horse. That alternative would apparently alleviate the parkland problem while simultaneously improving traffic flow and meeting safety concerns.

the Department of Transportation Act. *Brooks v. Coleman*, 518 F.2d 17, 18 (9th Cir. 1975).

▆▆▆ An improved two–lane road was never considered.[5] Because we hold that the improved two–lane road was a reasonable alternative to be considered, we find that the Secretary failed to consider all alternatives in making his § 4(f) determination, *see Citizens to Preserve Overton Park v. Volpe, supra,* and the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). We do not hold that the two–lane alternative must eventually be chosen, only that it must be considered. Therefore, remand to the Secretary for further consideration is appropriate on this aspect of the case.

IV. Compliance with Procedural Requirements of the Federal–Aid Highway Act and NEPA

The Coalition attacks the sufficiency of the 1969 and 1971 hearings,[6] contending that there was little or no discussion of social, economic, and environmental impacts of the proposed project as required by 23 U.S.C. § 128(a) and regulations thereunder in accordance with NEPA and the Federal–Aid Highway Act, as amended. The Coalition also asserts that a new corridor and design hearing was required before approval of the project because location approval was not requested within three years.

Policy and Procedure Memorandum (PPM) 20–8, ¶ 6(e), in effect during all relevant times in this case, provided:

If location approval is not requested within 3 years after the date of the related corridor hearing held, or an opportunity for a hearing afforded, under this PPM, a new hearing must be held or the opportunity afforded for such a hearing.

23 C.F.R. 1.38 App.A (1971) (as amended and codified in 23 C.F.R. § 790.5(e) (1979)).

▆▆▆ It is undisputed that location approval was requested more than three years after the September 1, 1971, hearing. De-

---

**5.** Five alternatives were discussed in the final EIS–4(f) statement that affected the taking of parkland. Alternative A, a "couplet system" that would avoid any taking of acreage from Hungry Horse Park, was studied but rejected because it would have had more adverse effects on the adjacent Hungry Horse Camp, another parkland of "local significance." Alternative B ran north of the existing road and would have avoided any involvement with § 4(f) lands, but was deemed imprudent because it would bypass the existing downtown business area, would increase problems with the planned water system, and would have required relocation of 27 families. Alternative C followed the existing road, taking all needed right–of–way from the north side of the road and did not require the taking of any § 4(f) lands. This alternative was rejected because it would have required all expansion of the roadway to be taken from the business district. Alternative E consisted of a smaller 68–foot four–lane roadway without any turnbays. It was rejected because turnbays were found to be necessary for safety reasons. Alternative D, running along the existing roadway and taking some small portions from both Hungry Horse Camp and Hungry Horse Park, was selected.

**6.** On January 8, 1969, the MDOH conducted a "corridor hearing" in Hungry Horse under the provisions of § 24 of the Federal–Aid Highway Act of 1968, 23 U.S.C. § 128. About eighty

persons attended the hearing. There was some discussion about curb and gutter plans. Concern was expressed whether the improvement would have adverse effects on business or make snow removal more difficult. Child safety was also discussed.

On May 27, 1971, a draft environmental impact statement was released by the MDOH and distributed to 23 local, state, and federal agencies for comment. There was no press announcement of its availability and, at that time, none was required by regulation.

On September 1, 1971, the MDOH conducted a combined "corridor and design" hearing at Hungry Horse pursuant to 23 U.S.C. § 128(a) and regulations thereunder, 23 C.F.R. § 1.38 App.A. No one expressed objections to the four–lane design although alternative routes, safe crossings for children in Hungry Horse, and the necessity of a 20–foot median in Hungry Horse were discussed.

On January 31, 1975, the MDOH requested design approval for the Coram to West Glacier segment of the project. On February 10, 1975, the MDOH conducted an "informational" hearing in Hungry Horse and about 75 residents attended. Although no transcript was made of the hearing, it appears that alternative routes were again discussed, but that no one expressed objections to the four–lane design of the highway.

fendants argue, however, that the informational hearing of February, 1975, constituted substantial compliance with PPM 20–8. We disagree. PPM 20–8 unequivocally requires that a new hearing be held after three years and sets forth detailed hearing procedures. *See* PPM 20–8, ¶¶ 6–8. Significantly, a verbatim transcript of the hearing is required for the purpose of informing decisionmakers. No such transcript was made of the February, 1975, hearing. Although a brief written summary of the hearing was prepared by one official, we cannot say that this shows "substantial compliance" with the formal hearing requirements or provides decisionmakers with an adequate record upon which to base their decisions. To hold otherwise would be to defeat the important objectives of § 128(a) and NEPA. *See City of Davis v. Coleman,* 521 F.2d at 678–79.

Because we hold that a new hearing is required, we find it unnecessary to address the question whether the 1969 or 1971 hearings conformed to the requirements of 23 U.S.C. § 138(a) and regulations thereunder.

*CONCLUSION*

We reverse the judgment of the district court. On remand, the district court should enjoin construction of the highway until such time as defendants can demonstrate full compliance with 23 U.S.C. §§ 128(a) and 138, 42 U.S.C. § 4332, 49 U.S.C. § 1653(f), Mont.Rev.Code Ann. § 75–1–101, and applicable regulations. The district court may enter any other orders it deems appropriate to expedite final disposition of this case.

REVERSED.