**CONCERNED CITIZENS ON I–190
et al., Appellants,**

v.

**SECRETARY OF TRANSPORTATION
et al., Appellees.**

Nos. 80–1497, 80–1498.

United States Court of Appeals,
First Circuit.

Argued Nov. 4, 1980.

Decided Feb. 9, 1981.

David F. Cavers, Jr., Boston, Mass., with whom Katherine Hendricks, Stephen D. Anderson and Palmer & Dodge, Boston, Mass., were on brief, for appellants.

Charles K. Mone, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee U. S. Secretary of Transp.

Francis X. Bellotti, Atty. Gen., Edward F. Vena, Sp. Asst. Atty. Gen. and Gadsby & Hannah, Boston, Mass., on brief, for appellees Commissioner of the Massachusetts Dept. of Public Works and the Massachusetts Dept. of Public Works.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, HOFFMAN, Senior District Judge.[*]

COFFIN, Chief Judge.

This action was brought for declaratory and injunctive relief against further construction of a portion of Interstate 190, a federally-financed highway connector running through central Massachusetts from Worcester to Leominster. Appellants assert that three procedural prerequisites to completion of the project have not been adequately complied with: the preparation of an Environmental Impact Statement (EIS), the holding of public hearings, and the determination whether lands to be used for the construction constitute significant recreation land. The applicable statutes are 42 U.S.C. § 4332(2)(C), 23 U.S.C. § 128(a), and 49 U.S.C. § 1653(f), respectively. We are convinced that appellants have not demonstrated a probability of success as to any claimed procedural default, and we affirm the district court's denial of a preliminary injunction.

Plaintiffs-appellants in this action are Concerned Citizens on I–190, an unincorporated association, and six named individual members of that association (hereafter collectively "appellants"). Defendants-appellees are the United States Secretary of Transportation and an official of the Federal Highway Administration ("the federal defendants") and the Massachusetts Department of Public Works and its Commissioner ("the state defendants"). Appellants originally commenced their action on October 3, 1974, shortly after publication of the final EIS for the project; because their counsel withdrew from the case shortly thereafter, the case fell into desuetude until January 1980.

Appellants' principal attack is directed at the EIS prepared for the project, which they claim fails to take sufficient account of the danger to the metropolitan Boston drinking water supply posed by three distinct elements of the project: construction of the relevant portions of the highway itself, secondary development brought on by the opening of the highway, and design changes and mitigation measures instituted subsequent to the promulgation of the final EIS. Appellants assert that "a potentially catastrophic circumstance—the possible loss of the drinking water of nearly two million people—was 'swept under the rug' . . . and out of public view." The possibility of this catastrophe derives from the fact that 9.9 of I–190's 19 miles would go through the Wachusett Reservoir Watershed, a man-made reservoir which supplies approximately 40 percent of the drinking water serving metropolitan Boston, and through which flows the water from the Quabbin Reservoir supplying the other 60 percent. In particular, two sections of this 9.9 mile stretch would cross two of the Wachusett Reservoir's principal tributaries, the Quinapoxet River and the Stillwater River. The environmental danger posed by this construction is that erosion from adjacent banks will result in the deposit of sediment in the reservoir's tributaries and ultimately in the reservoir itself, leading to increased

[*] Of the Eastern District of Virginia, sitting by designation.

turbidity. Water flowing from the Wachusett is not subsequently filtered, but only chlorinated, and an increase in turbidity could impair the efficacy of such chlorination.

Appellants do not dispute that the EIS explicitly addressed this problem; they argue, however, that its discussion is "attenuated and equivocal." Appellees, of course, maintain that the EIS discusses the pertinent issues "candidly and frankly". To resolve this conflict we must first look to the purposes of Environmental Impact Statements and to the standards to be applied in reviewing their adequacy. We have observed that such a statement serves at least three purposes:

"First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard . . . . Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project . . . . Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug". *Silva v. Lynn*, 482 F.2d 1284–85 (1st Cir. 1973) (citations omitted).

Cf. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) (NEPA's "mandate to the agencies is essentially procedural"); *see also Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir. 1980).

In determining whether these ends have been attained in a particular case, we inquire "whether the agency's findings and conclusions in the EIS are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and whether the agency followed the procedures required by law." *Silva v. Lynn, supra*, 482 F.2d at 1284; *see* 5 U.S.C. § 706; *cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, supra*, 435 U.S. at 558, 98 S.Ct. at 1219 ("administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute."). We have recognized the limited scope of our review of a district court ruling concerning the adequacy of an EIS:

"Our role is not to substitute our judgment for that of the district court, but simply to see if the court avoided clear error in its determination of whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Cummington Preservation Comm. v. Federal Aviation Adm.*, 524 F.2d 241, 243 (1st Cir. 1975) (citation omitted).

Finally, we employ a "rule of reason" in deciding whether an agency has adequately considered the environmental consequences of a proposed action. *Commonwealth of Mass. v. Andrus*, 594 F.2d 872, 884 (1st Cir. 1978).

▮ Applying these principles to the case before us, we conclude that the EIS adequately discusses each of the three sources of potential danger to the metropolitan Boston water supply. The most important of these, of course, is the possibility of increased turbidity resulting from highway construction itself. This danger is explicitly addressed at numerous points in the EIS; several of these discuss the source and magnitude of the danger, while others focus on possible mitigation measures. Because these passages are of such central importance to our decision, we reproduce a number of them below, beginning with some of those that describe the danger posed:

"The Wachusett Reservoir and its feeder streams are the dominant natural environmental feature of the wide corridor, since they are a major terminal for metropolitan Boston's basic water supply. The reservoir has two basic functions: first, it stores and conveys high quality water; second, it plays a role in the natu-

ral treatment of waters prior to final distribution . . . ."

"In terms of water pollution, potential impacts can be caused by the highway construction, operation and maintenance. The potential significant adverse impacts of the proposed expressway on Wachusett Reservoir and its tributaries, and thus potential adverse impacts on the metropolitan Boston's water supply, have caused great concern to the engineers, environmentalists, and others closely associated with the proposed project . . . ."

"The most significant unavoidable detrimental impacts on human beings are the potential effects that the proposed expressway could have upon the quality of water in Wachusett Reservoir . . . ."

" . . . [M]ost waters within the wide corridor area ultimately drain into either Wachusett Reservoir, which is of major importance as the public water supply of over three dozen cities and towns of metropolitan Boston; or the Nashua River, which has to be considered a major aquatic resource of central Massachusetts in spite of current heavy pollution of that river. Because of the diversity of aquatic resources included within the wide corridor area and because of the various uses to which these individual resources are put, the question of water quality is extremely complex . . . ."

"There is a high probability that both alternatives of the proposed . . . expressway would lower the quality of water in the Wachusett Reservoir, its tributaries and/or the Nashua River tributaries. Note here that a high probability does not necessarily imply a major impact; i. e., the maximum predicted chloride concentrations are still well below U. S. Public Health standards . . . ."

"The water from Wachusett Reservoir is treated only by chlorination at present. A possible impact from the highway could be interference with present and future treatment processes. Turbidities at present in the reservoir are of levels just below those that interfere with chlorination. Any increase in turbidity could make disinfection with chlorine impracti-

cal unless treatment to remove turbidity were instituted."

The following excerpts are representative of discussions of turbidity in the EIS directed to the ways in which it might be minimized:

"A certain amount of erosion would take place during the construction in the wide corridor's predominantly glacial granular deposits, but these small problems would be minimized by abatement procedures described in the 'Proposed Measures to Minimize Adverse Impacts' section of Chapter IV."

"Some degree of soil erosion during construction would be unavoidable. The net effect, however, would be reduced to a minimum by utilizing construction techniques required by Massachusetts Department of Public Works standard construction contract specifications, which require early seeding . . . ."

"The degradation of watercourses by sediment from exposed slopes during construction would be controlled by the judicious use of sedimentation pools (Figure 9) which would be constructed at appropriate locations. These pools would provide a detention time for particles of silt to settle out of suspension prior to entering any watercourse. During construction, ditch checks (made of bales of hay) and toe of slope checks (made of brush) would be provided in areas prone to erosion. Precautions that might be used if warranted are the installation of check dams such as logs, brush and bales of hay which could be used adjacent to small shallow streams, and more sophisticated sedimentation pools which would be constructed where required . . . ."

"Special concern would be given during design and construction to utilize means of minimizing the turbidity with the Wachusett Reservoir watershed. Temporary disturbances to water quality associated with construction will be minimized by requiring limits on areas of bare excavations through early planting; sedimentation pools as illustrated in Exhibit 2 of Volume II; paved ditches; wood-chip

mulching; and the bridging of haul roads over streams rather than fording. During the operation and maintenance, particularly sensitive areas will be protected by collecting run-off for controlled disposal. Cuts and fills will be designed to minimize changes in the water table and in the direction of subsurface flow, thus, effects on vegetation and wildlife are expected to be insignificant."

In addition to these discussions, the EIS considers the turbidity problem both in a series of graphic presentations and in analyses of particular issues presented by specific alternative design proposals.

Appellants' claims that the EIS fails to quantify or emphasize the gravity of the danger posed, and that it relies on undocumented and unrealistic hopes for the various mitigation measures discussed, must be evaluated in light of these discussions. We are sympathetic to appellants' desire to ensure full consideration and discussion of this significant potential hazard. But we think the disclosure of it in the EIS taken as a whole demonstrate a clear recognition of the problem, provide notice of its significance to those who read it, and evince a concern for and a commitment to the mitigation of such a danger. While not directly attributable to the EIS, the environmental improvements subsequently introduced into the roadway design, discussed below, buttress this view. Even considering the EIS alone, we certainly cannot say that "the agency's findings and conclusions in the EIS are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", *Silva v. Lynn, supra,* 482 F.2d at 1284, or that "the district court . . . [committed] clear error in its determination", *Cummington Preservation Comm. v. Federal Aviation Adm., supra,* 524 F.2d at 243.

Looking back nearly a decade to the inception of this project, we are impressed by the number of vexing issues which have been resolved or no longer appear to be controversial. Appellants have singled out one issue in the EIS—admittedly a significant one—and focused intensive criticism on it. Mindful of the tendency of such searching scrutiny to magnify retrospectively any possible defect, and reiterating our view that this EIS gave due notice of the existence and magnitude of the contested issue, we conclude that the discussion in the EIS of the danger posed by the construction of the highway does not warrant enjoining that construction.

We thus turn to appellants' additional challenges to the adequacy of the EIS: first its discussion of the impact of secondary development, and second its failure to address changes in design and construction initiated subsequent to its promulgation. As to the former, the EIS essentially treats future development as too remote and speculative to discuss in any detail, and relies on hopeful projections of careful growth. Again we quote the pertinent passages:

"[T]he significance of [secondary development] will depend on its amount, quality, and the ability of the community or region to channel such growth positively in accord with its goals.

"[S]uch growth and development can be most beneficial when accompanied by good land in control [sic]. Positive or beneficial effects would include new desirable growth that would be induced by the proposed expressway."

We have recently had occasion to consider a rather similar treatment of secondary development in an EIS in *Cummington Preservation Comm. v. Federal Aviation Adm., supra,* 524 F.2d at 244, observing that:

"The precise issue of how the project might influence future development was not directly addressed; on the other hand it is not clear how much further the analysis could meaningfully be taken, so much being contingent upon unknown factors."

Nonetheless, we concluded that:

"Under all the circumstances we believe the EIS can be said to constitute a statement which enable[d] those who did not have a part in its compilation to understand and consider meaningfully the factors involved." *Id.* at 244 (quotation omitted).

We reach the same conclusion here. Again we appreciate appellants' concerns—concerns reflected in testimony by their experts and in comments on a draft EIS submitted by the Environmental Protection Administration—that the EIS underplays the possibility of adverse effects of secondary development. *Cf. Chelsea Neighborhood Ass'n v. United States Postal Svce.,* 516 F.2d 378, 388 (2d Cir. 1975) ("using [something] as a 'selling point' without disclosing its possible negative aspects is certainly not the 'environmental full disclosure' called for by the NEPA"). But in this case we agree with the district court that "the highly speculative nature of the [projected] growth" and "the existence of continuing opportunities to limit its adverse effects" renders the disclosure in this case at least minimally acceptable.

■ Appellants' final challenge to the adequacy of the EIS in this case rests on the ground that a supplemental EIS was required under applicable Federal Highway Authority (FHWA) regulations to reflect subsequent changes in mitigation measures and in legislation and regulations governing drinking water standards. We think the latter a misdirected attack: although the relevant FHWA regulations require a supplemental EIS where "substantial changes are made in the proposed action ... or significant new information becomes available concerning the action's environmental aspects", 23 C.F.R. § 771.15, passage of a new statute or regulation clearly does not constitute a change in the proposed action or any "information" in the relevant sense. The former is of course directed to a relevant kind of information, but we conclude that it fails here for two reasons: first because the additional mitigation measures implemented represent essentially a "specification and modification" (in the district court's words) of those discussed in the EIS, which "merely further reduce" its adverse effects, and second because it is undisputed that all of the changes implemented constitute *improvements* in the mitigation techniques involved.

Among these improvements were the establishment of an Erosion Control Monitoring Subcommittee composed of various state and federal environmental officials. Extensive studies and tests of new erosion control measures were commissioned, and an on-site environmental monitor was appointed. The defendants subsequently agreed prior to the commencement of construction to "include extraordinary measures in drainage and sedimentation systems ... [which] exceed the commitments made in the I–190 final EIS for protection of the water supply." *Cf. Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 961 (1st Cir. 1976) (supplemental EIS designed to insure awareness of environmental consequences of agency action). Indeed, the responsiveness to environmental concerns demonstrated by these changes reflects a commendable effort to comply with the spirit of NEPA. A requirement that a supplemental EIS be prepared each time such improvements were instituted would surely serve as a practical deterrent to just such desirable efforts.

In sum, we conclude that the district court committed no error in holding the EIS in this case adequate, and we turn to the two additional, independent grounds on which appellants seek an injunction: first, that the agency failed to conduct adequate public hearings in connection with the federal financing of highway construction as required by 23 U.S.C. § 128(a), and second, that the agency failed to make an adequate determination as to whether the construction passed through "significant publicly-owned recreation land" as required by 49 U.S.C. § 1653(f). We conclude that the district court's rejection of both claims was proper.

■ As to the public hearings, we approach appellants' claim with awareness of the long delay that elapsed before it was raised. The contested hearings were held in 1973–74; the final design hearings were held on December 10, 1974, and were attended by two of the individually named plaintiffs in this action. Yet the adequacy of hearings was not raised until the filing

of the second amended complaint in January 1980, nearly six years after the filing of the initial complaint. The Ninth Circuit has declined on the basis of laches to consider a claim at all in a strikingly similar context. *See Lathan v. Volpe,* 455 F.2d 1111, 1122 (9th Cir. 1971). We are content to rule that, taking this delay as one factor, and again applying a "rule of reason" as to the adequacy of the agency's actions, we find no reversible error in the district court's holding that the hearings constituted adequate recognition and discussion of the turbidity problem, its design implications, and possible mitigation measures.

▆▆▆▆ Finally, appellants challenge on several grounds the summary judgment granted defendants as to appellants' accusation that the construction would pass through "significant publicly-owned recreation lands". They assert first that the agency's action was procedurally inadequate, and in addition that several alleged genuine issues of material fact as to the nature of the lands involved render the court's grant of summary judgment inappropriate. We note initially that if the agency's action was procedurally adequate, the decision is committed to it and will be reversed only if arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See Silva v. Lynn, supra,* 482 F.2d at 1284.

The sole dispute as to the procedural adequacy of the agency's action concerns its reliance on the conclusion by a local body, the Metropolitan Development Commission, that the lands included did not constitute "significant ... recreation lands". Appellants rely on *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 412 n. 28, 91 S.Ct. 814, 821, n.28, 28 L.Ed.2d 136 (1971), and *Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dept.,* 446 F.2d 1013, 1026 (5th Cir. 1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972), for the proposition that the agency itself must make such a determination independently, and may not rely on a decision by local officials. But those cases addressed the agency's ultimate deci-

sion as to the lack of "feasible and prudent alternatives", not the very different threshold question whether significant recreational lands were involved. We agree with the district court that this threshold decision may properly rely on, and indeed should consider, such local officials' views. *See Pennsylvania Environmental Council v. Bartlett,* 454 F.2d 613, 623 (3d Cir. 1971).

Since we find the agency's determination procedurally adequate, summary judgment in its favor was appropriate unless appellants raised a genuine issue of material fact as to whether its substantive decision was arbitrary and capricious or an abuse of discretion. Appellants offered evidence suggesting that the publicly owned lands involved were recreationally significant, but no evidence indicated anything more than a possible disagreement with the merits of the agency's conclusion. Accordingly, we agree with the district court that summary judgment for the agency was proper.

In closing, we take note of an equitable consideration that reinforces our conclusion that no preliminary injunction should issue. Public hearings on the construction of I–190 began as early as 1973, and the agency published its final EIS for the project on September 3, 1974. Appellants commenced their suit on October 3, 1974, and their motion for a preliminary injunction was denied on October 9. As noted earlier, appellants' counsel withdrew from the case shortly thereafter, and the litigation lay essentially dormant until January 1980. Construction on I–190 began in April of 1975, with the four construction segments in the Wachusett Watershed, which were the final segments to be completed, ranging from 5 percent to 31 percent completed on May 29, 1980, and from 22 percent to 47 percent completed on October 1, 1980. Construction of northern and southern segments of the route that are to be linked by the contested segment has been completed, and those sections are open to traffic.

▆▆▆▆ We recognize that where, as here, a particular plaintiff is not the only party whose interests may be injured by a contested project, laches is a disfavored de-

fense in environmental cases, *see Jones v. Lynn*, 477 F.2d 885, 892 (1st Cir. 1973); *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 at 779 (9th Cir. 1980); *City of Rochester v. United States Postal Service*, 541 F.2d 967 (2nd Cir. 1976), and we are not inclined to hold appellants' action barred by the delay in pursuing their litigation. But we recognize as well that "[i]n determining whether delay is prejudicial, a pertinent inquiry is whether substantial work on the project had been completed before suit was brought." *Coalition for Canyon Preservation v. Bowers, supra*, 632 F.2d at 779; *see Save Our Wetlands, Inc. v. United States Army Corps of Eng'rs*, 549 F.2d 1021, 1027–28 (5th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). Specifically, as we have observed, "the question must be what agency decisions are yet to be made, and what decisions, although already made, remain open to revision." *Jones v. Lynn, supra*, 477 F.2d at 890; *cf. Coalition for Canyon Preservation v. Bowers, supra*, 632 F.2d at 779 (where "it would be difficult to alter the basic plan ... [c]ompliance with state or federal environmental policy acts may not result in any major changes or environmental benefits.") These observations reflect the fact that "the [EIS] process puts burdens on federal agencies; but it also demands, if it is to achieve its objective, a certain duty of attentiveness from citizens." *Ogunquit Village Corp. v. Davis*, 553 F.2d 243, 246 (1st Cir. 1977).

In this case, we think the relevant decisions have been largely made and substantial and relatively irrevocable work completed. Nor have these decisions been made either in disregard of the environmental concerns pressed here or in an attempt to rush the project to completion prior to judicial review. To the contrary, the defendants' post-EIS efforts have included what the district court termed "extraordinary measures" beyond those proposed in the EIS, and have reflected a consistent effort to mitigate the potential danger involved. Although we do not decide the case on the basis of these facts, they support our conclusion that no preliminary injunction should issue. Noting that appellants' desire to ensure protection of the Boston water supply is commendable and significant, we nevertheless conclude that the agency has been responsive to environmental concerns, and that there has been no lack of compliance with the environmental protection requirements at issue in this case. Because appellants have not demonstrated a probability of success as to any of their claims, the district court properly declined to order a preliminary injunction against continued construction.

*Affirmed.*