The PRESERVATION COALITION, INC., Plaintiff-Appellant,

v.

Samuel R. PIERCE, Jr., Secretary of the United States Department of Housing and Urban Development; Richard E. Eardley, Mayor, City of Boise; and the Boise Redevelopment Agency, Defendants-Appellees.

No. 80–3101.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 9, 1981.

Decided Feb. 12, 1982.

Burke, Boyd & Koontz, Boise, Idaho, on the brief.

Before SNEED and BOOCHEVER, Circuit Judges, and HOFFMAN *, District Judge.

SNEED, Circuit Judge:

The Preservation Coalition, Inc. (Coalition) filed this action contending that the Secretary of the Department of Housing and Urban Development (HUD), the Mayor of Boise, Idaho, and the Boise Redevelopment Agency (BRA) violated the National Environmental Policy Act (NEPA) by failing to prepare an environmental impact statement (EIS) in 1979 for the Boise Downtown Center Redevelopment Project. The Coalition also contended that the defendants violated the National Historic Preservation Act (NHPA) by deciding to demolish or substantially alter seven buildings in the project that are currently listed on the National Register of Historic Places.

The district court found that laches barred the NEPA claims, and, in the alternative, that the BRA reasonably concluded that an EIS was not necessary. It further found that defendants did not violate the NHPA. The Coalition appeals the NEPA findings. The National Trust for Historic Preservation (National Trust) has filed an amicus brief raising issues under the NHPA. The BRA insists that these issues are not properly before the court. HUD, on the other hand, in its brief addresses the NHPA issues on the merits.

We hold that laches does not bar the NEPA claims but that under the circumstances of this case there was no violation of NEPA. Finally, we hold the NHPA issues are not properly before this court.

I.

FACTS

In July 1969 HUD and the BRA entered into a loan and grant contract to fund an

Allen M. Katz, Munger, Tolles & Rickershauser, Los Angeles, Cal., argued for plaintiff-appellant; Antonio Rossmann, San Francisco, Cal., on the brief.

Maria A. Iizuka, Washington, D. C., William J. Russell, Elam, Burke, Boyd & Koontz, Bosie, Idaho, argued for defendants-appellees; Phillip Barber, Elam,

* Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

urban renewal project covering several blocks in downtown Boise (the R–4 contract). NEPA became effective January 1, 1970. On June 28, 1971 the defendants signed a similar loan and grant contract for additional downtown blocks (the R–5 contract). The BRA prepared environmental clearances on both the R–4 and R–5 contracts finding that the project would have no significant environmental impact; thus, no EIS was needed. HUD approved the BRA finding.

Portions of the project site were cleared between 1972 and 1978, but no construction took place. In 1973 the area was reviewed to determine if buildings were eligible to be placed on the National Register. Seven buildings were placed on the National Register in 1974. In 1978, the Eastman Building was added to the Register. The BRA signed Memoranda of Agreement with the Advisory Council on Historic Preservation regarding the listed buildings in 1974 and 1979, respectively.

In 1979, the BRA converted the funding for the project from urban renewal loan and grant funds to Community Development Block Grant (CDBG) funds by signing a "financial settlement" with HUD. At the same time, the BRA prepared a lengthy environmental assessment (EA) on the entire project. The study found that the project would have no significant environmental impact. HUD approved the finding, and the Coalition filed the instant action.

## II.

### LACHES

■ Before reaching the merits, we must consider whether, as found by the district court, laches bars the NEPA claims. Laches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy. Furthermore, citizens have a right to assume that federal officials will comply with applicable law and to rely on that assumption. *Coali-*

*tion for Canyon Preservation v. Bowers,* 632 F.2d 774, 779 (9th Cir. 1980); *City of Davis v. Coleman,* 521 F.2d 661, 678 (9th Cir. 1975). *See Cady v. Morton,* 527 F.2d 786, 792 (9th Cir. 1975).

■ Because application of laches is discretionary, the standard of review on appeal is whether the district court properly found (a) lack of diligence by the party against whom the defense is asserted, and (b) prejudice to the party asserting the defense. *Coalition for Canyon Preservation,* 632 F.2d at 779, *citing Lathan v. Brinegar,* 506 F.2d 677, 692 (9th Cir. 1974) (en banc). To support its finding of lack of diligence, the district court determined that the last "major federal action" occurred when HUD signed the R–5 contract in 1971 and that the Coalition failed to press its claim until September 24, 1979. *See Chick v. Hills,* 528 F.2d 445 (1st Cir. 1976); *Sworob v. Harris,* 451 F.Supp. 96 (E.D.Pa.1978), *aff'd without opinion, Sworob v. Harris,* 578 F.2d 1376 (3d Cir. 1978), *cert. denied, Sworob v. Harris,* 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979). The passage of eight years since the BRA and HUD signed the loan and grant contract was the rock on which the district court rested its finding of lack of diligence.

■ We believe the district court accorded too much significance to the eight year period. The factors that should be considered in determining diligence in this type of case are (1) whether the party attempted to communicate its position to the agency before filing suit, (2) the nature of the agency response, and (3) the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action. *Coalition for Canyon Preservation,* 632 F.2d at 779 (citing *City of Davis,* 521 F.2d at 673).

While each of these factors cannot be fitted precisely to the facts of this case, it should be pointed out that no buildings were placed on the National Register of Historic Places until 1974, that the Eastman Building was not so placed until 1978, and that the decision to demolish the Eastman

Building was not made until May 1979. Thereafter, the Coalition promptly complained to HUD about the need for an EIS before destroying an historic building. When HUD announced that no EIS was required, the Coalition immediately filed this action.

These facts clearly indicate that 1971 is not the relevant date for determining whether the Coalition's historic preservation and funding conversion arguments in support of its NEPA claim are barred by laches. The Coalition did not know that any historic building would be demolished until May 1979. The funding conversion occurred in the same year. Moreover, before bringing suit the Coalition told the BRA it opposed the project and its suit promptly followed a public meeting on the proposed destruction of the historic buildings. These facts demonstrate the degree of diligence required by *Coalition for Canyon Preservation*, 632 F.2d at 779.

■ Furthermore, even with respect to those aspects of the project known in 1971 that the Coalition challenges, the BRA has not shown sufficient prejudice to invoke laches. Delay may be *prejudicial* if substantial work has been completed before the suit was brought, but even substantial completion is sometimes insufficient to bar suit. *See, e.g., City of Davis*, 521 F.2d at 670 n.11 (highway interchange 50% completed). Although the amount of money expended and work completed may indicate how difficult it would be to alter the plan of the project, *Coalition for Canyon Preservation*, 632 F.2d at 779, increased cost from delay is alone not sufficient to establish prejudice. In enacting NEPA Congress contemplated that some delay would necessarily occur in the process of identifying potential environmental harm. *Id.* at 780; *see Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 868–69 (5th Cir. 1975). Here, however, although four square blocks were leveled for the Boise project in 1971, no construction has taken place. The project cannot be considered close to completion. *Cf. City of Rochester v. United States Postal Service*, 541 F.2d 967, 977 (2d Cir. 1976) (EIS required for post office 35% completed). It follows that laches bars none of the Coalition's claims.

### III.

### NEPA

#### A. Funding Conversion as a "Major Federal Action" Under NEPA

■ NEPA requires Federal agencies to make detailed reports on "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). We have held this standard met whenever substantial questions are raised as to whether a project may significantly degrade some human environmental factor. If an agency determines not to file an EIS, the reviewing court must consider whether the agency has reasonably concluded that the project will have no significant adverse environmental consequences. *City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980); *City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir. 1975); *see Portela v. Pierce*, 650 F.2d 210, 213 (9th Cir. 1981). The district court here found that the financial settlement that the BRA signed with HUD was not a major federal action.

#### 1. Funding Conversion as Equivalent to Authorizing Construction of a Parking Garage

The Coalition contends otherwise. It argues that since block grant funds will be used to build a 3000-car parking facility, for which purpose the urban renewal funds could not have been used, the conversion has caused all the environmental effects that ordinarily would be associated with construction of the parking garage. Thus, the conversion has, as would have had the construction of the garage, a significant environmental impact.

This overstates the matter. While the urban renewal funds could not have been used for parking construction, a parking facility was nevertheless part of the original plan. Under that plan the BRA committed itself to raise funds for the parking

facility to satisfy the state matching requirement. This had not been accomplished by 1978. The funding conversion simply removed a limit on the use of the federal money, but did not alter the planned scope of the project.

A funding change does not resemble changing an industrial park to a neighborhood development, *San Francisco Tomorrow v. Romney*, 472 F.2d 1021, 1025–26 (9th Cir. 1973). Instead, like a grant of additional funds to cover increased land acquisition and relocation costs, *id.*, the shift from urban renewal funds to CDBG funds does not affect the fundamental nature of the project, nor inject into it a new aspect which has never been considered. To the contrary, the parking facilities for whose construction CDBG funds will pay have always been considered essential. Any potential degradation of the environment flows, not from the funding conversion, but from the initial plans which included the parking facility.

2. Funding Conversion as a "Major Federal Action" Pursuant to HUD Regulations

The Coalition next argues that the funding conversion from urban renewal to CDBG funds requires an EIS under HUD regulations. To evaluate this contention properly it is necessary to analyze HUD's then-applicable environmental review procedures for the CDBG program which appear in Title 24, C.F.R. Part 58 (1979). Two sections of Part 58, §§ 58.19 and 58.20, are directly relevant.

Section 58.19 covers environmental review of continuations of previous activities. Section 58.19(a) states that a project which is a continuation of a previously commenced activity for which previously conducted environmental reviews "are insufficient due to changed circumstances, including the availability of additional data . . ., must be subjected to an . . . updated environmental review under this Part." This review "shall be carried out with respect to the entire project to the extent that the entire project or portions of it could still be altered in

light of environmental considerations." 24 C.F.R. § 58.19(a) (1979). Section 58.19(c) provides, however, that if environmental review has been completed and circumstances, including available data, have not changed significantly, no new environmental review is required.

Section 58.20 pertains to financial settlement of urban renewal projects. It makes additional requirements, beyond those for CDBG funding in general, applicable to applications for financial settlement of an urban renewal project prior to substantial completion thereof. Every such application becomes a "project" requiring environmental review. Section 58.20(a)(1) makes section 58.19(c), which permits, as indicated, forgoing of environmental review with respect to some continuations of previous activities, inapplicable to such applications. Furthermore, the environmental review must include an assessment of the environmental consequences of the financial settlement. *See* 24 C.F.R. § 58.20(a)(2).

Taken together, these provisions require that we recognize that HUD erred in concluding that the BRA complied with HUD regulations by filing a statement that the funding conversion itself had no significant environmental impact. *See* Affidavit of Ryomi Tanino, Clerk's Record Vol. II, Appendix E. The first paragraph of section 58.20 clearly states that it imposes *additional* requirements. Its requirements are additional to, but do not oust, those imposed by section 58.19 governing continuation of previous activities with respect to which changed circumstances, including additional data, have made a prior review insufficient. Thus, both section 58.20 *and* section 58.19 are applicable here. HUD regulations require not only an account of the impact of the financial settlement itself, 24 C.F.R. § 58.20, but also an updating of the environmental review where changed circumstances, totally independent of the financial settlement, make it desirable, *see* 24 C.F.R. § 58.19(a). That appellee's environmental reviews in 1971 and 1975 were adequate under the regulations then in effect in no way renders the 1979 regulations inapplica-

ble to appellee's application for financial settlement.

It cannot be denied that by 1979 the circumstances had changed from what they were in 1971 and 1975. *See* 24 C.F.R. § 58.19(a). The Eastman Building was added to the National Register in 1978. It also cannot be denied that the project in 1979 "could still be altered in light of environmental considerations." *Id.* And, of course, it cannot be denied that there was a "financial settlement" with HUD in 1979. *See* 24 C.F.R. § 58.20. It follows that the procedures outlined by sections 58.19 and 58.20 must be followed.[1]

BRA indeed followed these procedures in preparing its 1979 environmental assessment, which it assumed was required by applicable federal regulations, HUD's contrary interpretation notwithstanding. These procedures, however, do not lead irresistibly to imposing upon BRA the duty of preparing an EIS with respect to the 1979 funding conversion. The updated environmental review required by section 58.19(a) contemplates a new "clearance finding" that will take into account the information theretofore developed and the new factors. 24 C.F.R. § 58.19(b)(1). Preparation of the clearance finding is described in section 58.-15 which is captioned "Steps to commence environmental review process." Section 58.16 governs completion of the environmental review process where a clearance finding under section 58.15 has determined that the request for release of funds for the project (and, necessarily, any related action

whose review is required ancillary to the release of funds) is not an action which may significantly affect the environment. Under these circumstances, no EIS is required. 24 C.F.R. § 58.16. Here, BRA found precisely that the Boise project had no significant impact. Our task is to determine whether this finding under section 58.16 in the BRA's 1979 environmental assessment was reasonable. *Portela v. Pierce*, 650 F.2d 210, 213 (9th Cir. 1981); *City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980); *City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir. 1975).

a. Effect of Destruction of National Register Building.

■ The Coalition takes the position that the contemplated destruction or significant alteration of buildings listed on the National Register, without more, imprints BRA's finding of no significant impact on the environment with the mark of unreasonableness. It cites *WATCH (Waterbury Action, etc.) v. Harris*, 603 F.2d 310 (2d Cir. 1979), *cert. denied*, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979), in support of its position. *WATCH* can be read in this fashion. *Id.* at 318, 326. We decline, however, to follow *WATCH* when read in this fashion.

We regard the adoption of such a rule as inconsistent with at least the spirit of *San Francisco Tomorrow v. Romney*, 472 F.2d 1021 (9th Cir. 1973). There we refused to regard amendatory contracts, which increased funding for the sole purpose of providing for the rising cost of land acquisi-

---

1. 24 C.F.R. Part 58 has since been substantially revised. However, it appears that under the new regulations supplementary review would still be required. *See* 24 C.F.R. § 58.19 (1980). If the regulations do not demand such supplementation, the statute itself probably requires it. *Cf. Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980) (continuing duty to supplement).

Current Council on Environmental Quality guidelines for agencies address only the need to update draft or final EISs, not environmental assessments. The guidelines now provide that agencies "(1) Shall prepare supplements to either draft or final environmental impact statements if: ... (ii) There are *significant* new circumstances or information relevant to envi-

ronmental concerns and bearing on the proposed action or its impacts." (emphasis added). 40 C.F.R. § 1502.9(c) (1981). However, logic would also require supplementation in the less frequent situation where significant new circumstances or information relevant to environmental concerns arises after an initial finding of no significant impact.

Supplementation of an environmental assessment after designation of historic buildings in the project area to the National Register would not, of course, be required where applicable environmental review has been previously carried out in a timely and proper manner. *See Central Oklahoma Preservation Alliance v. Oklahoma City, etc.*, 471 F.Supp. 68 (W.D.Okl.) (1979).

tions and relocation of displaced residents, as "further major federal action" within the meaning of NEPA. Our refusal indicates that within this circuit federal action subsequent to the initiation of a project must be evaluated comprehensively and in terms of its relationship to the environmental effects of the entire project. Only then can it be determined whether the recent federal action amounted to "further major federal action."

Presently agencies prepare some 1,000 EISs and some 30,000 environmental assessments annually. U.S. Council on Environmental Quality, *Environmental Quality—1976*, pp. 123, 132. The environmental assessment is an established part of NEPA environmental review. *See, e.g., Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), *and later appeal*, 484 F.2d 448 (2d Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); *Portela v. Pierce*, 650 F.2d 210, 213 (9th Cir. 1981) ("environmental clearance"); *City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980); *City of Davis v. Coleman*, 521 F.2d 661, 674 (9th Cir. 1975) ("negative declaration"). As a screening device, the environmental assessment allows agencies with limited resources to focus on truly important federal actions. We decline to remove this screen by imposing a *per se* rule. *See* Stewart & Krier, *Environmental Law and Policy* 754 (2d ed. 1978).

*Hart v. Denver Urban Renewal Authority*, 551 F.2d 1178 (10th Cir. 1977), is not inconsistent with our approach in this case. There it was held that the loan and grant contract's provision that HUD approve all acquisitions and dispositions of property by the urban renewal authority established a continuing federal involvement sufficient to make the approval by HUD of the sale of a National Register building "further federal action." Our approach to the "continuing involvement" of HUD is guided by HUD's

own regulations on CDBG funding rather than by a "continuing involvement" gloss on NEPA. Whether this gloss exists in this circuit need not detain us. HUD's own regulations, in this instance, embody its substance in any event. Neither, moreover, requires that we adopt the *per se* rule of *WATCH*.

■ It, therefore, becomes necessary to determine whether the district court erred in holding that the Boise project, at the time of the funding conversion, had "no significant impact" on the human environment under NEPA. The standard of review we must apply to an agency's failure to prepare an EIS is whether the agency's action was reasonable. *See Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980) (updating prior review); *Portela v. Pierce*, 650 F.2d 210 (9th Cir. 1981); *City and County of San Francisco v. United States*, 615 F.2d 498 (9th Cir. 1980); *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975). *But cf.* Shea, The Judicial Standard for Review of Environmental Impact Statement Threshold Decisions, 9 *Boston College Envt'l Affairs L. Rev.* 63 (1980) (Administrative Procedure Act requires "arbitrary and capricious" standard of review).

b. Reasonableness of BRA's Finding.

■ We commence our review by recognizing, as we must, that NEPA requires federal agencies to preserve important historic and cultural aspects of our nation's heritage. 42 U.S.C. 4331(b)(4) (1976). *See Aluli v. Brown*, 437 F.Supp. 602, 607 (D.Haw.1977), *reversed in part*, 602 F.2d 876 (9th Cir. 1979) (archaeological sites). Furthermore, judgments of historical significance made by the Advisory Council on Historic Preservation, the expert regulatory body concerned with preserving, restoring, and maintaining the historic and cultural environment of the Nation, Exec. Order No. 11,593, 36 Fed.Reg. 8921 (May 15, 1971), deserve great weight.[2] However,

---

2. Executive Order 11,593 requires federal agencies to institute procedures, in consultation with the Advisory Council on Historic Preser-

vation, to assure that Federal agencies carry out their responsibilities of historic preservation under NHPA. Thus, cooperation with the

compliance with the NHPA, even when it exists, does not assure compliance with NEPA. Each mandates separate and distinct procedures, both of which must be complied with when historic buildings are affected.[3] *Cf. Stop H–3 Ass'n v. Coleman,* 533 F.2d 434, 444–45 (9th Cir. 1976), *cert. denied, Wright v. Stop H–3 Ass'n,* 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976) (NEPA compliance does not constitute NHPA compliance). Execution of a "Memorandum of Agreement" with the Advisory Council on Historic Preservation, on the other hand, does not relieve a federal agency of the duty of complying with the impact statement requirement "to the fullest extent possible," 42 U.S.C. § 4332.

There are, however, similarities between the demands and goals of NEPA and the NHPA. Both Acts create obligations that are chiefly procedural in nature; both have the goal of generating information about the impact of federal actions on the environment; and both require that the relevant federal agency carefully consider the information produced.[4] That is, both are designed to insure that the agency "stop, look, and listen" before moving ahead. NHPA compliance will often be relevant to a determination of whether a threshold finding of no significant impact on the historic environment was reasonable. Nonetheless, unless agency regulations specifical-ly mandate otherwise,[5] each Act must be taken on its own terms.

(1) Impact on Historic Environment.

Turning to the particulars of this case, we find that the BRA carefully considered information about the Boise project's impact on the historic environment, as shown in the list of documents attached to Mayor Richard R. Eardley's July 27, 1979 letter to Gerald Huard, Acting Area Manager for HUD. With respect to the Eastman building, the BRA determined it to lack significance based on several factors: lack of a public perception of historic or other significance, the inadequacy of the comments and attached documents supporting the finding of significance in the Nomination Form, and the fact that the Eastman building's colorably significant features were better represented in other buildings that were being retained. In particular, the BRA relied on a report by architect Ernest Lombard assessing the impact on the historic environment. With respect to the other historic buildings in the project area, the BRA determined that no features integral to the historic, cultural, or architectural significance of the buildings will be affected. On balance, the careful manner in which the BRA considered historic information and the thoroughness of its statement ex-

Advisory Council is a regulatory mandate. Of course, Advisory Council decisions are of greater weight for NHPA purposes, where their role is prescribed by statute, than for NEPA purposes. *See generally* Rose, *Preservation and Community: New Directions in the Law of Historic Preservation,* 33 Stan.L.Rev. 473 (1981).

3. NEPA requires detailed statements on major federal actions significantly affecting the quality of the human environment, including the historic and cultural environment, 42 U.S.C. § 4332(C), whereas the NHPA requires federal agencies, prior to the approval of the expenditure of federal funds on any undertaking, to take into account the effect of the undertaking on National Register buildings, and to afford the Advisory Council on Historic Preservation a reasonable opportunity to comment. 16 U.S.C. 470f. Thus, the NHPA mandate is much more narrowly focused.

4. *See* note 3 *supra.* The U.S. Supreme Court recently emphasized the procedural character of NEPA in *Strycker's Bay Neighborhood Council, Inc. v. Karlen et al.,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). In overruling the Second Circuit's finding that the EIS was insufficient, the Court held that a reviewing court is limited to ensuring that the agency has considered the environmental consequences of its action. The Supreme Court chided the court below for requiring HUD to "elevate environmental concerns over other, admittedly legitimate, considerations. Neither NEPA nor the APA provides any support for such a reordering of priorities by a reviewing court." *Id.* at 438.

5. For example, HUD Handbook 1390.1, 38 Fed. Reg. 19182, which applies only to HUD's own projects, requires an EIS for "any project which has an adverse effect on a property listed on, or nominated to the National Register of Historic Places." *Id.* at 19189 (Appendix A–2).

plaining its decision not to require an EIS convinces us that the BRA's finding of no significant impact on the historic environment was reasonable. *See Gribble, supra,* at 1024–25.

### (2) Impact on Air Quality.

While the massive documentation on air pollution compiled by the BRA demonstrates the care and thoroughness of its approach, the agency's finding of no significant impact on air quality was seriously flawed. Since many of the "mitigations" proposed by the agency were not project or project-related modifications but potential actions to be taken by public and private bodies not controlled by the agency or the City of Boise,[6] reliance on them to reduce the level of significance attached to the project was improper. The significance of the adverse environmental impact of a particular agency action cannot be obviated by pointing to the beneficial environmental impact of a different and unrelated action. For example, the fact that automobiles may eventually have to meet certain emission standards does not mean that a project which will greatly increase use of automobiles in a particular area no longer has an impact on that area's environment. While it is true that the impact would be substantially mitigated by emission controls, it is also true that air quality would be improved to a greater extent by emission controls *and* no project at all.

Of course, when the initial plans for a project indicate adverse environmental effects, modifications to the original design, including firm commitments by other parties to take mitigating actions, may eliminate or mitigate the project's effects on air quality. These modifications may make the preparation of an EIS unnecessary. When the compensatory action is to be undertaken by third parties, their commitments, while they need not be contractual, must be more than mere vague statements of good intentions. *See City and County of San Francisco v. United States,* 615 F.2d 498, 501 (9th Cir. 1980) (mutual action "well-coordinated" between city and Navy).[7]

While some of the mitigating factors considered by BRA failed to meet this standard, others are project-related changes closely planned with the City of Boise or for which BRA held firm commitments from the developer, Winmar. These include the City's commitment to reduce new construction of parking in the redevelopment area by 8.5% from the number in the project description; to require parking in the project to be managed for short-term usage; and to undertake a van-pooling incentive program for municipal and other employees sufficient to increase current van-pooling ridership by 25%. The City is also committed to increasing transit usage during off-peak hours from the present 1982 estimated level of 35% of total transit usage to approximately 50% of total transit usage, an increase of 2,000 transit riders daily to the downtown area. Private auto travel to the downtown center would decrease correspondingly. The City will accomplish this

---

6. Given the common interest and close cooperation of the City of Boise and its agency, the BRA, in implementing the downtown project, for purposes of mitigation efforts they are essentially the same entity.

7. Another circuit has noted that environmental effects of the kind ordinarily calling into play an EIS requirement could only be obviated by a showing that the effects were curtailed by modification of the project design. *Maryland-National Capital Park & Planning Comm'n v. United States Postal Service,* 487 F.2d 1029 (D.C. Cir.1973). This circuit has upheld a finding of no significant impact where traffic congestion to be caused by leasing a naval shipyard would be mitigated by the City expanding major traffic arteries into the shipyard. *City and County of San Francisco v. United States,* 615 F.2d 498 (9th Cir. 1980). There, the mitigating activities were not carried out by the agency alone (the Department of the Navy). However, they were to be carried out by the City in close cooperation with the Navy. Without the project, the arteries would not have been expanded. Moreover, plans for the reopening of the facility, including expansion of major arteries into the shipyard, had been "well-coordinated" with the City of San Francisco, the plaintiff. Thus, expansion of the arteries could properly be considered to mitigate traffic congestion caused by the project.

goal with such specific measures as increased transit service to downtown and the mall area, provision of preferential treatment for transit along major downtown corridors (including transit rights-of-way, signal preemption, and bus turn lanes), incentive systems for transit usage by downtown employees and shoppers, and elimination of free parking in downtown for commuters. Absent the project, these changes would not have occurred. Thus, they are appropriate mitigating factors.

Certain contractual obligations of the developer, Winmar, also meet the required standard. The Disposition and Development Agreement with BRA requires Winmar to meet detailed design requirements for pedestrian access to encourage walking to the mall, to reduce employee automobile usage within the center through incentive programs, and to provide safe facilities for bicycle storage within the retail center. Limits on the number of parking spaces and the required use of short-term parking management techniques are embodied in the agreement. When considered together, these measures are sufficient to support the conclusion that the finding of no significant impact on air quality was reasonable.

(3) Impact on Noise Level and Traffic Congestion.

■ Appellants also contend that the project will have a significant impact on noise pollution and traffic congestion. We note at the outset that where a federal project conforms to existing land use patterns, zoning, or local plans, such conformity is evidence supporting a finding of no significant impact. *Maryland-National Capital Park & Planning Commission v. United States Postal Service*, 487 F.2d 1029, 1036 (D.C.Cir.1973); *Central Oklahoma Preservation Alliance v. Oklahoma City, etc.*, 471 F.Supp. 68, 78 (W.D.Okl.1979). The primary effect of the project here, as in *Central Oklahoma*, is "to reverse and mitigate existing adverse environmental trends and conditions by replacing an obsolete and deteriorating retail-commercial area with a new one." Land use, in its broadest sense,

is not altered; it merely will transpire in better surroundings. This strongly supports the environmental clearance approved by HUD. It avoids the impacts on air quality, water quality, wildlife, and noise such as are generated by dams, expressways, airports, or even new business districts. *Central Oklahoma, supra*, at 78.

The developer and BRA are contractually obligated to cooperate in scheduling or modifying construction activities to reduce noise. The City will mitigate congestion from closing Idaho and Main streets by obtaining a written commitment from the Ada County Highway District to increase the priority of the downtown circulation plan for improving traffic flow around the project. The Mayor will not allow closure of Main or Idaho streets before reasonable and substantial progress on the downtown circulation plan has, in his judgment, occurred.

Therefore, we conclude that the finding of no significant impact on noise level and traffic congestion was reasonable.

IV.

NHPA

The National Trust for Historic Preservation in its amicus brief contends that section 470f of the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, applies to the Boise project. The National Trust contends that *WATCH (Waterbury Action, etc.) v. Harris*, 603 F.2d 310 (2d Cir. 1979), requires HUD to comply with the NHPA whenever it exercises any continuing control over a project that receives federal funds.

■ Under the circumstances of this case we decline to reach the issue. The Coalition raised both the NEPA and NHPA issues in its complaint. The district court passed on both claims. The Coalition has appealed, and it has raised only issues relating to NEPA in its opening brief. The government has responded to the NEPA issues in detail, but contends that the National Trust, as amicus, cannot raise issues not raised by the parties. In its reply brief,

the Coalition has again responded only to the NEPA issues.

 Normally, we should consider only issues raised in the opening brief. 9 Moore's Federal Practice, ¶ 228.02[2.—1] at 28–7 & n.2. Issues raised in the reply brief ordinarily should not be considered. *Id.* at ¶ 228.02[2.3] at 28–9. *But see Gebhard v. S.S. Hawaiian Legislator*, 425 F.2d 1303, 1306 n.1 (9th Cir. 1970) (considering issues raised for the first time in a reply brief to avoid unduly harsh result). The party appealing generally is entitled to frame the issues; but exceptional circumstances may require that these rules be suspended. *See, e.g., Consumers Union of United States, Inc. v. FPC*, 510 F.2d 656, 662 & n.9 (D.C. Cir.1975).

This is not such a case, however. Here the amicus was not involved below. It has no right to appeal the judgment. *Moten v. Bricklayers, Masons, and Plasterers, International Union of America*, 543 F.2d 224, 227 (D.C.Cir.1976). The issue it seeks to raise was raised by the parties below and disposed of by the district court's judgment. Had the Coalition wished to preserve this issue on appeal, it could easily have done so. It did not. Consequently, it has waived the issue. Had the National Trust wished to raise the issue properly in this case, it could have intervened instead of appearing as amicus. It did not. Therefore, the issue is not properly before us.

## V.

### CONCLUSION

Although the Coalition's NEPA claims are not barred by laches, neither the conversion from urban renewal funds to CDBG funds in 1979, nor HUD regulations applicable to that conversion, nor the planned destruction of a building included on the National Register requires an EIS for the Boise project. Preparation of an *environmental assessment* in 1979 to evaluate new information leading to changed circumstances with respect to the project's impact on the historic and cultural environment was required by then-applicable HUD regu-

lations. However, the 1979 environmental assessment's finding of no significant impact was reasonable. As modified by this opinion, the judgment of the court below is

AFFIRMED.