**FRIENDS OF ENDANGERED SPECIES, INC., Plaintiff,**

**v.**

**Robert A. JANTZEN, et al., Defendants.**

**No. C–83–3837 SW.**

United States District Court,
N.D. California.

Jan. 7, 1984.

See also, 589 F.Supp. 113.

Land and Natural Resources Div., Charles M. O'Connor, Asst. U.S. Atty., San Francisco, Cal., Dianne H. Kelly, Atty., U.S. Dept. of Justice, Washington, D.C., for federal defendant.

Albert E. Polonsky, City Atty., City of Daly City, Daly City, Cal., for defendant, City of Daly City.

David J. Byers, Deputy Dist. Atty., County of San Mateo, Redwood City, Cal., for defendant, San Mateo County.

John D. Hoffman, Ellman, Burke & Cassidy, San Francisco, Cal., for defendant, Visitacion Associates.

Joseph J. Cook, II, Miller, Starr & Regalia, Oakland, Cal., for defendant, Presley of Northern California, Inc.

George Silvestri, Jr., Bagshaw, Martinelli, Corrigan & Jordan, San Rafael, Cal., for defendant, City of Brisbane.

George P. Agnost, City Atty., City of South San Francisco, South San Francisco, Cal., for defendant, City of South San Francisco.

Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant, W.W. Dean & Associates, Inc.

Charles E. Chase, Burlingame, Cal., for defendant, Foxhall Inv., Ltd.

## ORDER AND MEMORANDUM OF LAW DENYING MOTION FOR PRELIMINARY INJUNCTION

SPENCER WILLIAMS, District Judge.

Plaintiff, Friends of Endangered Species (FOES), came before this Court on November 21, 1983, seeking a preliminary injunction to stay the issuance of a permit by the United States Fish and Wildlife Service (FWS) to the County of San Mateo and the cities of Daly City, Brisbane, and South San Francisco. The permit allows the "incidental taking" of three federally protected endangered species by authorizing development of part of the San Bruno Mountain. Defendants are FWS, the County, the three cities named above, and five developers who own land slated for develop-

Michael Freund, Albany, Cal., for plaintiff.

Joseph P. Russoniello, U.S. Atty., Rodney H. Hamblin, Asst. U.S. Atty., Chief,

ment on the Mountain. This Court had previously denied plaintiff's application for a temporary restraining order on November 17, 1983.

Plaintiff contends that the issuance of the permit violates the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* Plaintiff claims, primarily, that irreparable harm will befall the Mission Blue butterfly by reason of grading activity by defendant Presley of Northern California, which was scheduled to begin on part of the Mountain known as the Saddle on November 17, weather permitting.

After consideration of the arguments presented, the Court finds that plaintiff has failed to demonstrate that impending irreparable harm will result from the proposed activities, that the public interest mandates an injunction, or that plaintiff has a substantial likelihood of success on the merits. Therefore, **IT IS HEREBY ORDERED** that plaintiff's motion is **DENIED.**

## I. BACKGROUND

A brief history of the planned development of San Bruno Mountain is necessary to place the present controversy in context.

San Bruno Mountain is 3500 acres of undeveloped land on the San Francisco Peninsula. In 1975, defendant Visitacion Associates and the Crocker Land Company, a co-owner of Visitacion, owned virtually all of the Mountain. They proposed major development of the land there.

A citizens' group, the Committee to Save San Bruno Mountain, formed to oppose the development. In response to the controversy, the San Mateo County Board of Supervisors passed the San Bruno General Plan Amendment ("Amendment") in 1976.

By 1980, litigation between Visitacion Associates and the County over the Amendment reached a mutually satisfactory solution. As a result of the settlement, Visitacion and the Crocker Land Co. sold or donated over 2000 acres on the Mountain to the County and State for parkland. About one-third of the Mountain was therefore designated for development, while two-thirds was dedicated to parks.

On March 28, 1980, soon after the final conveyances of the property, FWS issued a re-proposal to list the Callippe Silverspot Butterfly, found in some numbers on the Mountain, as an endangered species, and to designate its critical habitat pursuant to Section 4 of the Endangered Species Act, 16 U.S.C. § 1533. The newly proposed critical habitat overlapped most of the remaining area on the Mountain reserved for development.

Nearly simultaneously, the Mission Blue Butterfly, which was already on the endangered species list, was found to inhabit some of the area to be developed. (Later in 1980, FWS allowed the proposal to list the Callippe Silverspot to expire, leaving the Mission Blue at the center of the current litigation. Two other endangered species, the San Bruno Elfin Butterfly and the San Francisco Garter Snake, also have habitat on the Mountain, but are not found in significant numbers in the areas to be developed.)

In order to adequately safeguard the endangered species, while fulfilling promised development opportunities, the San Bruno Mountain Steering Committee was formed in May of 1980. It was ultimately made up of representatives of San Mateo County, the three cities involved, prospective developers, FWS, the California Department of Fish and Game, and the Committee to Save San Bruno Mountain.

The Steering Committee initiated a two-year Biological Study of the Mission Blue and Callippe Silverspot butterflies to determine their population and distribution on the Mountain, and to determine whether development would conflict with the continued existence of the species. Although the Mission Blue and Callippe Silverspot were the focus of the study, it also gave consideration to several other species not listed as endangered. The County selected and hired Thomas Reid Associates, which had performed an earlier study for Visitacion

Associates when the butterfly situation had first come to light, to conduct the study.

The study concluded that the butterflies inhabited most of the grassland portions of the Mountain, including those areas slated for development. It also concluded that, if development did not occur, the species would be threatened through natural forces by the loss of its grassland habitat to encroaching brush, noxious to the butterflies.

In October of 1981, the Steering Committee began developing a Habitat Conservation Plan ("HCP") based on the study. The final HCP, completed in November, 1982, was incorporated into an implementing document called the "Agreement with Respect to the San Bruno Mountain Area Habitat Conservation Plan" (the Agreement). The Agreement was executed by the County, the cities, the major landowners and developers involved on the Mountain, the California Department of Fish and Game, and the California Department of Parks and Recreation.

The Agreement dedicated 793 privately owned acres as open space, preserved 81% of the open space on the Mountain as undisturbed habitat, with another 3% to be restored after temporary disturbance during construction, and required contribution of $60,000 annually, adjusted for inflation, by lot owners on the Mountain to finance a permanent habitat conservation program. The County agreed to supervise the program through a conservation manager and an advisory committee of scientists. According to the HCP, 14% of the population of the Mission Blue on the Mountain would be disturbed by the development.

Notwithstanding the Agreement and HCP, before development could proceed on the Mountain, the Endangered Species Act required FWS to issue a permit pursuant to Section 10(a) of the Act, 16 U.S.C. § 1539(a) ("permit"), authorizing the "incidental taking" of the endangered species. As a prerequisite to its issuing the permit, FWS was required by Section 7 of the Act, 16 U.S.C. § 1536, to conduct an inter-agency consultation and issue a Biological Opinion certifying that the proposed permit was not likely to jeopardize the continued existence of the endangered species.

Also, NEPA required an Environmental Assessment ("EA") to determine whether the permit would have significant adverse environmental consequences; if so, a full blown Environmental Impact Statement ("EIS") would be necessary.

After public hearings and opportunity for written comment, as provided by the regulatory scheme, FWS issued a Biological Opinion on March 4, 1983, concluding that no jeopardy to the continued existence of the species would result from planned development under the permit. It also issued a final Finding of No Significant Impact ("FONSI"), based on a joint Environmental Impact Report/Environmental Assessment ("EIS/EA") which had been prepared cooperatively by FWS and the State, pursuant to state and federal regulations. The FONSI permitted waiver of a full EIS. Finally, FWS issued the Section 10(a) permit on the same date.

The permit was conditioned upon the implementation of the Agreement and the HCP. It allows incidental taking of the Mission Blue on the Mountain, but prohibits the taking of the San Francisco garter snake and the San Bruno Elfin Butterfly within their designated habitat, unless an amendment to the permit is granted.

## II. STANDARD OF REVIEW

To be entitled to a preliminary injunction, plaintiff must show likelihood of success on the merits; a threat of irreparable harm of injury outweighing the harm to defendants from an injunction; and that the public interest would be served by an injunction. *National Wildlife Federation v. Adams*, 629 F.2d 587, 590 (9th Cir.1980); *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir.1978).

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

Not surprisingly, the majority of the briefs and voluminous exhibits submitted in

this case are directed to the merits. After carefully examining this material, the Court concludes that plaintiff's likelihood of success on the merits is not great.

## A. Violation of the Endangered Species Act

Plaintiff claims that the FWS violated Section 10(a) of the Act, as amended in 1982, and Section 7(a)(2). Section 10(a) allows FWS to permit an otherwise prohibited taking of an endangered species if the taking is incidental to an otherwise legal activity. That section requires, however, that an applicant submit a comprehensive conservation plan. Before FWS can issue a permit, it must scrutinize the plan and find that: (1) the taking will be incidental; (2) the applicant will minimize and mitigate the impacts to the extent possible; (3) adequate funding will be insured; and (4) the taking will not appreciably reduce the likelihood of survival of the species. 16 U.S.C. § 1539(a).

In this case, FWS found that the issuance of the permit would be likely to *enhance* the survival of the Mission Blue Butterfly and the other two endangered species on the Mountain by protecting the diminishing grassland portions of the Mountain which make up their habitat. FWS noted specifically that the HCP and Agreement would result in conveyance of 74% of the butterfly's habitat on the Mountain into public ownership; provide for regulation of 88% of the habitat; initiate a program which would alleviate the threatening encroachment of noxious brush; and insure adequate funding. *See* Section 10(a) Permit Findings, App. A., Item 33. Plaintiff attacks these findings as unsupported by "substantial evidence."

■ The standard of review for agency action such as FWS's granting of a permit is set by the Administrative Procedure Act, 5 U.S.C. § 706, and caselaw interpreting it. Rather than "substantial evidence," the proper standard is whether the challenged action is arbitrary or capricious, or an abuse of discretion. The court should not intervene unless there has been a "clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ The ironic shortcoming of plaintiff's attack on defendant FWS's compliance with Section 10(a) is that the 1982 Amendment to that section, which allowed the issuance of the permit for "incidental takings" upon an approved conservation plan, was expressly based on the San Bruno Mountain situation. The HCP and the Agreement were extensively discussed in the legislative history of the Amendment. The House Conference Report states that "the adequacy of similar conservation plans [proposed as conditions for permits] should be measured against the San Bruno Plan." H.R.Rep. No. 97–835 (97th Cong., 2d Sess. 30–32 1982), U.S.Code Cong. & Admin.News 1982, pp. 2807, 2872. The Senate Report cites it as an example of a case where the "overall effect of a project can be beneficial to a species even though some incidental taking may occur." Senate Rep. No. 97–418 (97th Cong., 2d Sess.1982).

Plaintiff attempts to avoid the significance of these expressions of approval by stating that Congress never scrutinized the substantive content of the Biological Study or other environmental documentation. Essentially, plaintiff attacks the findings of FWS in support of the permit and the conclusions and methodology of the Biological Study, upon which they were based.

Plaintiff's arguments overlook the determinative issue in this case: if the agency has considered all relevant factors, and a rational basis exists for its findings, the Court may not overturn those findings. *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. at 823; *Camp v. Pitts,* 411 U.S. 138, 142–143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972). All of the material criticisms of the Biological Study and Permit Findings set forth by plaintiff in its papers were submitted during the public comment period for the issuance of the permit. FWS responded to every one in writing. *See* App. A, Items 32 and 33. The Court is unable to say that

those responses, and the Permit Findings themselves, are unreasonable.

Moreover, the Biological Study was submitted to three independent experts for formal, written "Peer Review." *See* App. A, Items 7, 8, and 9. All three concluded that the methodology of the study was sound, and two specifically endorsed the planned implementation of the HCP. Although plaintiff's primary criticism is that the mark-release-recapture rates yielded by the study's field work are deficient, Dr. Ward B. Watt of Stanford University wrote: "State-of-the-art techniques have been employed to calculate or estimate the population parameters mentioned from an extremely extensive mark-release-recapture data base." App. A, Item 8. Dr. Paul Ehrlich, also of Stanford University, wrote that "[t]his 'biological study' is unquestionably the most thorough and well-conceived 'EIR-type' report to pass through these offices." App. A, Item 9. The third expert, Dr. Arthur Shapiro of U.C. Davis, commented that, based on the recapture rates and other butterfly studies, "this program was reasonably successfully." App. A., Item 7.

In support of its criticisms, plaintiff submits affidavits by two of its own experts. See Declarations of Drs. Hafernik and Arnold. However, in a situation where experts may differ, the Court's task is not to determine who is "right", but to decide whether the agency arrived at a rational decision after consideration of all relevant criticisms.

Plaintiff also attacks compliance by FWS with Section 7(a)(2) of the Act. That section gives FWS the duty to "insure that any action authorized ... is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification" of the species' critical habitat. 16 U.S.C. § 1536(a)(2). In making that determination, FWS "shall use the best scientific and commercial data available." *Id.* Plaintiff claims that FWS violated that section by: (1) not using the best data available in preparing its Biological Opinion finding no

serious threat, and (2) by not deferring action on the permit pending resolution of the listing status of the "candidate" Tree Lupine Moth and eleven species of plant.

Plaintiff's first argument lacks merit for the same reason that its Section 10(a) attack fails. The Biological Opinion prepared by FWS pursuant to Section 7 was necessarily based on the data in the Biological Study. The evidence in the record discussed above indicates that the data was, in fact, the best available.

Plaintiff's second asserted violation of Section 7(a)(2) is based on the incorrect premise that FWS has an obligation to protect non-listed species which are under consideration for listing by preventing action which may threaten their habitat. Plaintiff asserts that the Tree Lupine Moth and eleven species of plant, all of which are in the earliest stage of consideration for listing, will also be threatened by construction activity.

A brief description of the procedure which leads to listing is appropriate here. A species becomes a "candidate" for listing when a petition from any interested party is received. After determining that a petition is "substantial," FWS has twelve months to decide whether to designate the species as "proposed" by publication in the Federal Register. Finally, after a public comment period and extensive consideration, a proposed species becomes "listed." *See* 16 U.S.C. § 1533; 48 Fed.Reg. 36062–36069 (Aug. 8, 1983).

The Tree Lupine Moth and eleven plant species discussed by plaintiff have never been more than candidates for listing, and had not even been designated as proposed when FWS issued its Permit Findings and Biological Opinion. Even had the species been proposed, however, the Act does not require a "limitation on the commitment of resources" until the species are listed. 16 U.S.C. § 1536(a)(4).

In *Wilson v. Block,* 708 F.2d 735 (D.C. Cir.1983), the court was faced with an argument similar to plaintiff's in this case. After examining the legislative history and language of Section 7, the court held that

that section was intended to protect only species actually listed, and not those in the process of evaluation. *Id.* at 748. The court also rejected the plaintiff's argument that a species under consideration for listing should be treated as if it were listed because of alleged unreasonable delay in the evaluation process by the Forest Service. The court found no evidence of bad faith or unreasonable conduct by the agency in failing to list the species. *Id.* at 751. In the present case, plaintiffs also fail to demonstrate any bad faith by FWS.

**B. Violation of NEPA**

NEPA requires an agency to prepare a full blown Environmental Impact Statement ("EIS") if "substantial questions are raised as to whether a [federal action] may cause significant degradation of some human environmental factor." *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir. 1975). To determine whether an EIS is necessary, an agency performs an Environmental Assessment ("EA"). If the agency makes a Finding of No Significant Impact ("FONSI"), no EIS need be prepared.

In this case, the EA was prepared jointly with the Environmental Impact Report ("EIR") by the County required by state regulations. Federal regulations require cooperation among local and federal officials, to the extent possible, in preparing environmental documents. *See* 40 C.F.R. §§ 1500.5(h) and 1506.2. Pursuant to this mandate, FWS and the County prepared a joint document.

Plaintiff claims generally that a full EIS should have been required under the circumstances of this case. Specifically, it argues that the EIR/EA was inadequate because it failed to properly consider the impacts of, and alternatives to, the issuance of the permit, as required by NEPA. Plaintiff also contends that FWS improperly delegated its authority by relying on the Biological Report of a private consulting firm with an alleged conflict of interest. In essence, plaintiff attacks the FONSI and granting of the permit as improper under the requirements of NEPA.

In a recent NEPA decision, the Ninth Circuit stated the burden of proof on this point:

> [It] is firmly established in this Circuit that an agency's determination that a particular project does not require the preperation of an EIS is to be upheld unless unreasonable.

*Foundation for North American Sheep v. Dept. of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982).

The inquiry is therefore very similar to the issue with respect to compliance with the Endangered Species Act, discussed above. The question here is not whether the issuance of the permit will *in fact* have no significant environmental impact. Rather, the court must determine only whether FWS "reasonably concluded" that the project will have no adverse environmental consequences. Moreover, it must be remembered that the focus of *federal* concern here, and therefore the focus of NEPA, is the impact of the issuance of a permit to take endangered species on the environment. The impact of the development of San Bruno Mountain on the environment, generally, is an issue of state and local concern which has been extensively considered at those levels.

In this case, FWS reached its conclusion after extensive consideration of information in the EIR/EA, the HCP, and the Biological Study upon which these were substantially based. These documents indicated that the issuance of the permit, conditioned upon compliance with the Agreement, would not seriously jeopardize the continued existence of the endangered species.

Moreover, the Ninth Circuit has held that where the initial plans for a project indicate adverse environmental impacts, modifications to the original plans, in the form of requirements of mitigating measures, may eliminate the need for an EIS. *See Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 860 (9th Cir.1982) (upholding a FONSI for federal grants to aid a city redevelopment project).

Relying in part on *Pierce,* the D.C.Circuit has decided a case involving issues similar to those in the current case. In *Cabinet Mountain Wilderness/Scotchman's Peak Grizzly Bears v. Peterson,* 685 F.2d 678 (D.C.Cir.1982), the Forest Service proposed to approve an exploratory drilling program that both that agency and FWS found harmful to the grizzly bear, an endangered species. In a Biological Opinion under Section 7 of the Endangered Species Act, the FWS recommended extensive mitigating measures such as restrictions on the activities and equipment of the drilling personnel. The Forest Service made the grant of the permit conditional upon compliance with these mitigating measures, and issued a FONSI. Citing *Pierce* and other cases, the court held that the FONSI was not unreasonable under those circumstances. In finding "that the agency's decision not to prepare an EIS was reasonable and adequately supported," the court stated:

> Here the agency conducted a thorough analysis of the proposed action and imposed specific measures to address the relevant areas of environmental concern. The agency concluded the proposal as modified would not cause any significant environmental impacts.
>
> .    .    .    .    .    .
>
> For us to overturn it under these circumstances would require an unjustifiable intrusion into the administrative process.

*Cabinet Mountains,* 685 F.2d at 684.

As in that case, here the original proposal threatened an endangered species. Mitigating proposals in the form of the HCP were made, and the FONSI was based on a guarantee of compliance with those measures by the private parties involved. Interference by the Court in this instance would be similarly inappropriate.

Plaintiff also contends that the EIR/EA failed to assess the cumulative impacts of the various developments proposed for the Mountain, and that it did not adequately consider alternatives. Regulations under NEPA require the consideration of the impacts of, and alternatives to, the proposed federal action. *See* 40 C.F.R. § 1508.9(b).

Documents are sufficient under NEPA if they "provide decisionmakers with an environmental disclosure sufficiently detailed to aid in the substantive decision, and make available to the public information about the proposed project's environmental impact." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974). A reasonably thorough discussion is all that is required. *Id.* Moreover, "NEPA does not set forth significant substantive goals for the nation, but its mandate is essentially procedural." *Vermont Yankee Nuclear Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

The EIR/EA prepared by FWS does discuss at length the cumulative impact of the takings allowed under the permit. *See* EIR/EA at III–1 to III–24, App. A, Item 25. It is important to keep in mind that it is only the cumulative impact of the *takings,* and not the non-federal impacts of the development to which they are incidental, which determines whether an EIS is necessary in this case. *See Save the Bay, Inc. v. U.S. Corps. of Engineers,* 610 F.2d 322, 326–27 (5th Cir.1980). As noted above, the *general* cumulative impact of the planned development upon the environment has been considered by state and local officials pursuant to statutes and regulations at those levels. Moreover, each development planned for the Mountain has been the subject of separate environmental impact reports by the County and concerned cities. FWS expressly relied on this "harmony" with local land use decisions in determining that the permit did not require an EIS. *See* FONSI, p. 1, App.A, Item 36. In another case where the validity of a FONSI was at issue, the Ninth Circuit said that it "specifically recognized such compliance as a factor pointing toward the validity of a conclusion that there is no significant impact on the environment." *Goodman Group, Inc. v. Dishroom,* 679 F.2d 182, 186 (9th Cir.1982).

■ The EIR/EA also contains an adequate discussion of alternatives to the issuance of the permit. *See* EIR/EA VI–1 to

VI–5, App.A, Item 25. The yardstick here, as elsewhere under NEPA, is one of reasonableness. There is no need even for a full EIS to consider alternatives whose effect cannot be reasonably ascertained, and whose implementation is deemed remote. Rather, the EIS need only set forth those "alternatives sufficient to permit a reasoned choice." *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir.1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Also, NEPA does not require that "alternatives within alternatives" be separately considered and explored. *Mid-Shiawassee v. Train*, 408 F.Supp. 650, 656 (E.D.MI 1976), *aff'd*, 559 F.2d 1220 (6th Cir.1977). Most of the alternatives which plaintiff alleges were ignored by FWS are, in fact, similar to, or subsets of, alternatives which *were* considered. For example, plaintiff contends that FWS should have considered the alternative of deferring action on the permit pending the ultimate resolution of the listing status of the Tree Lupine Moth and eleven species of plants. This would amount, in effect, to delaying the project indefinitely, since the time table for final resolution is uncertain. This alternative is essentially the same as Alternative A in the EIR/EA, "No Project/No Action—Delay." App.A., Item 25.

Other alternatives suggested by plaintiff are simply unreasonable. Plaintiff suggests that a land swap be made which would place the Saddle portion of the Mountain in public ownership. The Saddle was, at one time, privately owned, and this would effectively reverse and unwind a transaction between the public and private actors made pursuant to the County's previous land use decisions.

■ Plaintiff's final argument is based on the fact that the private research contractor who conducted the Biological Study underlying the NEPA documents had previously performed a butterfly study on the Mountain for one of the defendants. Plaintiff alleges that the documents are therefore tainted with a bias toward development, and also that FWS improperly delegated its duty under NEPA.

In *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir.1973), the Ninth Circuit upheld an EIS prepared in part by "a private consulting firm which had a major and direct contingent financial interest" in the project under review. *Id.* at 467. The consultant's financial interest was in the form of a "Guaranteed Maximum Compensation" consisting of 15.5% of the estimated total project cost. Nevertheless, the court held that:

> [N]othing ... in either the wording of NEPA or the case law ... indicates that, as a matter of law, a firm with a financial interest in the project may not assist with the drafting of the EIS ... While [the consultant] may have assisted with the EIS' preparation, the significant and active participation by the [agency] therein precludes us from concluding that there was any improper or illegal delegation in this case.

*Id.* at 467–68.

Other circuits have also held that the substantial participation of a private consultant in the preparation of an EIS and its underlying documentation is not improper if the federal agency actively participates in the process and takes full responsibility for the final document. *See, e.g., Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974); *Essex County Preservation Ass'n v. Campbell*, 536 F.2d 956, 959–60 (1st Cir. 1976).

In this case, the participation by FWS was sufficient to insure that the final conclusions of the environmental documents were not merely "rubber stamped", as plaintiff charges. Two FWS representatives participated actively in the review of the Biological Study by the Steering Committee, including the field data. One of the representatives, Ralph Swanson, worked with the County in reviewing the EIR/EA. *See* App. A, Items 16, 28. After the County had certified the EIR/EA under state regulations, FWS prepared its own addendum to clarify certain portions. App. A, Item 25B. In sum, the procedures followed

by FWS fell within the requirements of NEPA, as those standards have been interpreted by the courts.

## IV. IRREPARABLE HARM AND PUBLIC INTEREST

▆ Even had plaintiff established a likelihood of prevailing upon the merits, the Court seriously doubts that the balance of hardships and the public interest support a preliminary injunction in this case. As the threatened irreparable harm from the failure to grant relief, plaintiff points primarily to grading by one of the defendants scheduled to begin in November on part of the Mountain known as Reservoir Hill. According to evidence supplied by experts, all of Reservoir Hill contains only 2% of the population of Mission Blues on the Mountain, and the part to be graded only .3%. Declaration of Reid (Nov. 3, 1983) pp. 4, 8. Even plaintiff's experts acknowledge that the Saddle area of the Mountain, of which Reservoir Hill is a part, is of "relatively poor habitat quality" for the Mission Blue and of "lowest biological value" for that species. Declaration of Hafernik, p. 5. Moreover, grading will not affect any area known to be Mission Blue habitat until February, at the earliest. Declaration of Reid (Nov. 3, 1983, p. 7). Because the Court can almost certainly consider the merits of this case before that time, provided that the parties cooperate, there is little justification for the extraordinary remedy of injunctive relief.

For their part, defendants contend that an injunction would have considerable adverse consequences for both public and private interests. In addition to increased interest cost resulting from delay of their projects, some of the private defendants are involved in option agreements which have already been extended multiple times. Further delay may cause some parties to fail to exercise these options. *See, e.g.,* Declarations of Eubanks, Dolter, and Mezoian. The municipal defendants assert that delay of development will delay much needed public works which are part of the projects, cost them tax receipts, and de-prive their residents of housing and commercial opportunities until the conflict is resolved. *See, e.g.,* Declarations of Birkelo, Polonsky, and Koenig. Although these hardships might not, *ipso facto,* prevent the issuance of an injunction in the face of more substantial demonstration of irreparable harm and likelihood of success on the merits of plaintiff's arguments, in this case defendants clearly win the balancing test.

Finally, the public interest here does not favor the issuance of an injunction. In amending the Endangered Species Act to allow this and similar projects, Congress indicated its intent to encourage private participation in the conservation process, with adequate agency supervision to insure results consistent with the spirit of the Act. In discussing the Amendment to Section 10(a), the Conference Report states:

> To the maximum extent possible, the Secretary should utilize his authority under this provision to encourage creative partnerships between the public and private sectors and among government agencies in the interest of species and habitat conservation.

H.R.Rep. No. 97–835 (97th Cong., 2d Sess. 30), U.S.Code Cong. & Admin.News 1982, at p. 2871.

The HCP in this case, the model for Section 10(a) permits under the 1982 Amendments, resulted from extensive cooperation between the private and public sectors, as well as numerous third parties. Although the Court is aware of plaintiff's fundamental disagreement with the ultimate resolution of the parties to develop San Bruno Mountain, the Court is satisfied that defendants have complied in exemplary fashion with the requirements set for them by Congress. Therefore, plaintiff's motion for a preliminary injunction must be DENIED.

IT IS SO ORDERED.